## LUKE BROWN v. FRANK W. GILCHRIST AND MARSHALL N. BEDFORD.

*Negligence—Fellow-servants—Charge to jury—Contributory negli-gence.*

1. A foreman intrusted with the general supervision of a coal and freight business, including the unloading of vessels laden with coal, and the employment and direction of men for that purpose, is not a fellow-servant with them, and the master is responsible for his negligence in performing such delegated duties.[1]

2. It is error for the court in a negligence case to refuse to instruct the jury that, if plaintiff's own negligence caused or contributed to the injury, he cannot recover.

[1] See *Adams v. Iron Cliffs Co.*, 78 Mich. 272; *Van Dusen v. Letel-lier*, Id. 493 (b); *Hunn v. Railroad Co.*, Id. 513; *Harrison v. Rail-road Co.*, 79 Id. 409.

Error to Alpena.    (Kelley, J.)    Argued January 17, 1890.    Decided April 11, 1890.

Negligence case.    Defendants bring error.    Reversed. The facts are stated in the opinion.

*Frank Emerick* and *Depew & Rutherford*, for appellants.
*Turnbull & Dafoe*, for plaintiff.

[The points of counsel are stated in the opinion, and the authorities applicable to the questions at issue are so fully reviewed in the opinion, and in the cases cited in the foot-note to head-note 1, that their restatement from the briefs of counsel is omitted.—REPORTER.]

LONG, J.   The defendants, at the time of the injury complained of, were carrying on the coal and freight business at Alpena, in this State, keeping a dock and warehouse, and receiving freight from boats engaged in domestic commerce.   Their freight-house, office, and coal-dock were all on the same dock, near together, and the bins into which the coal was put were about 18 feet from the edge of the dock, and about 8 feet high.   The manner in which the coal was unloaded from the vessel was that horses, a quantity of which were kept constantly on hand, were placed along the dock, and running boards laid on top, extending from the top of the bin, over the rail of the vessel, to the hatchways, and the ends of the hatchways supported by two upright pieces on each side of the hatch, through which iron pins were run, and a plank or scantling placed across the side of the hatch, resting on these pins; the planking of the runway resting on this transverse scantling, about eight feet above the hatch.

The defendants had in their employ a Mr. Reed, who was a foreman, looking after the unloading of the boats,

and attending to the freight business of the firm generally. On June 30, 1888, the barge Westford lay at the dock, laden with coal. She had two hatchways, and two runways were placed from the bin,—one to each hatch. These were erected, under the direction of Mr. Reed, on that morning, by the laborers who were there to unload the coal. Mr. Reed pointed out to them where the horses and planking were, and they built the runways from the material so furnished, and before the plaintiff came there to work. It appears that the plank or timber resting on the iron bars was a 2x8 or 2x10 white pine, about 12 feet long, resting on the pins, which were some 8 feet apart. In order to hoist the coal from the hold of the vessel, a pulley was attached to the mast, a rope run through, to one end of which was attached a bucket, and the other end wound around a drum in the hold; the drum being revolved by an engine used for that purpose. This drum operated the two buckets; one for each hatch, and going up and down at the same time. To operate these buckets, which held about a half barrel each, a man, called a "dumper," stood on the end of the runway, over the edge of the hatch, and steadied the rope so that the bucket could not catch on the end of the planking; that is, he held the rope away far enough so that the bucket could come up safely. This coal was emptied into wheelbarrows on the runway,—two barrows being used for each runway, and a man for each barrow, who came up, with the barrows, alternately; a turn out being upon the runway for the purpose of their passing each other.

The plaintiff, on the morning of June 30, 1888, went with a Mr. Hite to the defendants' docks to get employment,—he and Hite having learned that two men were going to quit. They were accustomed to this kind of work, and had before assisted in unloading vessels. Arriv-

ing at the dock, Hite spoke to Reed about working, who said: "All right. Go to work,"—and Hite then turned to the plaintiff, and told him it was all right, and they went to work; and Reed took the time. The plaintiff went to work on the after scaffold, wheeling coal. The plaintiff testifies as follows as how the injury occurred:

"I wheeled for some time, when they stopped to lengthen out the line, as the coal was getting lower in the hold of the boat, and we thought that was a good time to go down, and answer a call of nature. In returning the other two men happened to get on the staging before I did. One of these men was tending to the buckets coming up, so that they would not catch on the staging, and the other man was wheeling along with me, that is, he was wheeling his own barrow. I saw John Reed [the defendants' foreman] standing on the rail of the boat, and he says: 'Brown, we are waiting for you.' I says: 'All right; you won't have to wait long on me.' With that, I got upon the staging, and the other man was going to take my wheelbarrow. 'Never mind,' says I, 'I will take my own wheelbarrow. Stand aside.' With that he stood aside, and I went to catch up my own wheelbarrow. I had it up. Down went the scaffolding, and I was pitched backward in the hold. I struck right on my back, and there came part of the staging onto my leg, and broke it in two places; and my back was hurt more than my leg."

Plaintiff also gave testimony showing that he was seriously and permanently injured. He also gave testimony tending to show that this plank, resting upon the iron pins holding the running boards, broke near the center, between the pins, thus causing the fall of the plank, which precipitated his fall into the hold of the vessel, 20 feet below, and that this plank or scantling so broken was worm-eaten, and contained knots, and was wholly unfit for the purpose for which it was being used.

The claimed negligence set out in the declaration is that the defendants, not regarding their duty in this behalf, erected, and caused to be erected, said scaffold or

platform and gangway out of rotten and unsound tim-
bers and material, so that the same gave way, and fell
while the plaintiff was working thereon. The declaration
charges a duty upon the defendants to build such scaffold
of strong and sound timbers and materials, and in a strong
and substantial manner, so that the same would not fall
while plaintiff was working thereon.

The defendants gave testimony tending to show that
this timber was sound, contained no knots, and was of
sufficient strength for the purposes for which it was being
used, and that the accident occurred by reason of the
fact that these men left their places, and on returning—
two wheelbarrows being there, loaded with coal—tho
dumper could not reach out to guide the rope, so that
the bucket caught on the end of the planking extending
over the edge of the hatch, lifting them up for a dis-
tance, and that, in falling with the weight of the three
men and the coal, they broke the scantling, and that this
was the occasion of the injury.

Mr. Redman, who was standing near, gave his version
of the casualty as follows:

"Mr. Brown went after a drink, and the bucket came
up, and my nephew, he dumped Mr. Brown's bucket;
and at that time the bucket went down, and they loaded
her with coal again, and the other bucket came up.    At
that time Mr. Brown just got back there by the wheel-
barrow when this bucket was swinging back and forward,
and it struck this staging, the same as here, and raised
it up; and it fell down, and broke it through.    The bucket
was swinging backward and forward, and coming up, at
the same time.    I suppose the dumper did not stop it
because he could not get at it.    It was on that side; and.
Mr. Brown being here with his full wheelbarrow, he could
not reach over there.    Brown left his wheelbarrow stand-
ing at the end of the scaffold where it was loaded.    At
that time the other wheeler was just coming back with
his wheelbarrow.    My nephew dumped the bucket in
Brown's barrow.    He was the wheeler there, and the bar-

row stood waiting Brown's return.   My nephew was standing on one side, the dumper on the other, the bucket swinging back and forward.   Brown got in between the handles of his barrow, when it broke down."

The captain of the barge and others gave the same version of the accident.   Defendants also gave testimony tending to show that they had plenty of good material to make scaffolding from; and one of the men working upon it, and who helped build it, testified that he selected this timber that broke from a pile of lumber in defendants' mill-yard, which is just adjoining the dock, and that it was a new piece.

There seems to be no controversy but that Mr. Reed set the men to build the scaffold, and that the plaintiff was not there at the time.   Neither does there seem to be much controversy as to the position which Reed occupied. Defendant Bedford testified that—

"Reed was acting in the capacity of a kind of foreman, looking after unloading boats, and attending to the freight business generally."

On the question of the defendants' providing plenty of suitable and good material of which to construct the scaffold, some considerable testimony was given, from which it appears, under the testimony of Mr. Reed, that the material for this structure was kept piled upon the dock beside the coal bins; that the defendants had about 15 dock horses, and two sets of deck horses to go on the boat, and 20 to 25 running boards, and lots of cross-pieces.   And Mr. Reed testifies that he did not think the stick which broke could have been knotty or worm-eaten, "because there is lots to put in there," and that he stood there, and told the men who put this scaffold up, "if there was not enough there, there was lots in the mill-yard."   Mr. Otto Redman, working on the platform, says that he helped put the scaffold up; that the stick was a

piece of Norway; and that they picked it out for themselves to work on, and had a whole pile in the mill-yard to select from.

The contention of the defendants' counsel is—

1. That the defendants provided plenty of suitable and good materials of which to construct the scaffold.

2. That they placed the oversight and charge of building it with a competent and fit servant.

3. That the same was put up under the direct personal supervision and direction of Reed, the defendants not being present or superintending or directing in person the erection, or the selection of the materials of which it was composed.

Counsel claims from these facts it follows, as a matter of law, that defendants had discharged the full measure of their duty towards the plaintiff; that is, that when the master has furnished all necessary and proper and safe material, and a competent and fit foreman, to whom he intrusts the whole supervision of the work being carried on, he is no longer responsible, and for the negligence of the foreman he cannot be held responsible. This claim is based upon the proposition that Reed is the fellow-servant of the plaintiff, and if this is true the learned counsel is correct in his conclusions; but if Mr. Reed was a superior servant, standing in the place of the master, then the master would be held liable.

This is a question upon which the courts are not in harmony, and each case is so dependent upon its own peculiar facts that it is difficult to lay down any general rules by which all cases can be governed. Here the facts are that the defendants gave over to Reed the entire charge of selecting the materials, and putting up the scaffold, and unloading the coal; and he had authority, or at least exercised it upon that occasion, to employ the men to do the work. This of itself is strong evidence that he stood in the place of the defendants, represent-

ing them in the work, and was not an ordinary employé. The contract of employment with the plaintiff was that he should have a safe place to work, and the law imposed upon the defendants the duty to furnish such a place. If the scaffold had been erected under the supervision and direction of one of the defendants themselves, and the casualty had occurred, as claimed by the plaintiff, by reason of the defective, worm-eaten, and knotty timber, which the defendants knew, or by reasonable care could have discovered, was dangerous in that place, then the plaintiff would have had the right to recover for such injuries, unless himself negligent. I am not prepared to say that the master, under such circumstances, can shift his responsibility by the selection of a foreman; and I do not understand that this doctrine has ever been held by this Court.

Counsel cites *Quincy Mining Co. v. Kitts*, 42 Mich. 34, as upholding that doctrine and sustaining his position. The rule is expressly laid down in that case that—

"The duty of due care in the employment and retention of competent servants is one the master cannot relieve himself of by any delegation; and, if it becomes necessary to instrust its performance to a general manager, foreman, or superintendent, such officer, whatever he may be called, must stand in the place of his principal, and the latter must assume the risks of his negligence."

While it is the truth that, under the circumstances of that case, it was held that the company could not be held liable, yet it is expressly stated that the Court looked in vain for any evidence appearing in the record that Wagner was negligent. Some general rules were laid down in that case, but they related to the case then in hand, which was very different from the present.

Counsel also cites *Hoar v. Merritt*, 62 Mich. 386, as sustaining the rule. But a critical examination of that

case shows a very different state of facts than the present. There the defendant, Merritt, in building his house, furnished plenty of good materials, which were actually used. in building the scaffold. He had an architect employed by the month; and competent carpenters, acting under him, built the scaffold for their own use in putting up the cornice to the building. After the cornice was completed the defendant employed Mr. Zryd to do the painting. The plaintiff was engaged by Zryd to assist in this work; and, going upon the scaffold, it gave way, and he was injured. The material furnished was good, and there was no explained reason why it fell. It was not, therefore, questioned that the carpenters who built the scaffold were competent, and that they selected good materials. Neither did they build it for the use of the painters. Another important feature existing in the present case did not appear in that. Here Mr. Reed not only had the full charge of the men, but employed them, and directed their work. They were not shown to be carpenters, or in any way qualified to select good material, or competent to erect a proper and safe scaffold; and, if the testimony of the plaintiff and his witnesses is true, they erected a very unsafe one, and from material not fit for that purpose, and which they placed where the most danger should have been apprehended, upon the edge of the hatch, and over a hole 20 feet in depth. The power and authority given to Mr. Reed far exceeded the authority given Gregory in *Hoar v. Merritt, supra*. Counsel, in his brief, even uses the argument that, because Reed had such absolute control and direction in and about the business there, the defendants could not be held responsible. He says:

"And there is absolutely no ground on this record for any claim that either of the defendants was present or superintending or directing in person the erection of this

scaffold, or the selection of the materials of which it was composed."

That is, because the defendants had delegated the authority to Mr. Reed to select proper materials, and to direct, control, and superintend the erection, they should escape liability. If this were the rule, then the more they remained away from their business,—the greater power and authority they gave a foreman or manager to select material, employ men to build a safe and proper scaffold, upon which other servants, who had no knowledge of the manner of its construction, were to be invited to work,—the less the liability. It is the duty of the master to furnish the servant a safe place to work upon, and he cannot shift this responsibility by saying:

"The foreman whom I employed was selected with care, and for his fitness for the work entrusted to him. I pointed out to him all necessary and proper material; and, therefore, though he did not make a proper selection of material, and did not build a safe structure, my hands are clean, and no responsibility rests with me. I have discharged the full measure of my duty to the men whom he guides and controls."

Especially is this true if it appears, as in this case, that he has entrusted the entire management and control of that business in the hands of such foreman, with power to employ the men, and he himself retires from any direction and control over it. Mr. Reed apparently had this authority; and, from the manner of the accident claimed by the plaintiff, it is evident that the men selected by Mr. Reed to find the timber to support these running boards were wholly unfit to build such a scaffold. It was Reed's duty to examine this scaffold, and see that it was properly built, before sending the plaintiff there to work; and, under the authority delegated to him by the defendants, and the control he assumed of affairs

there, he stands in their place, and they must assume the risks of his negligence. Upon this branch of the case the instructions given by the circuit judge were proper.

The court was in error in refusing the defendants' seventh request to charge, as follows:

"If plaintiff's own negligence caused or contributed to the injury, he cannot recover."

The court should have directed the attention of the jury to the claim made by the defendants' counsel as to the negligence of plaintiff. The theory of the defendants was that the plaintiff, and the others with whom he was working upon the runway, went away, and left the wheelbarrows there in such a position that the dumper could not properly control the rope,—thus permitting the bucket to catch the end of the scaffold, and raising it; and, when loosened, it dropped back upon the cross-piece, which, with the added weight of the coal and both barrows, and the three men, caused the breaking. If the breaking of the cross-piece was caused in this manner, and resulted from the negligence of the plaintiff or the men immediately employed with him, or by their negligence in this regard they contributed to the injury, the plaintiff could not recover, and the jury should have been so instructed. It was probably an oversight in the trial judge in refusing this request, as the rule is undoubtedly well understood by the learned circuit judge that in all actions for injuries caused by the alleged negligence of another the plaintiff himself must be free from fault, to sustain his action.

The judgment must be reversed, with costs, and a new trial ordered.

CHAMPLIN, C. J., and MORSE, J., concurred with LONG, J.

GRANT, J. I concur in the result.