### SHIPPEY *v.* GRAND RAPIDS LEATHER CO.

MASTER AND SERVANT — EMPLOYÉ IN TANNERY — OPEN VATS — WALKING IN DARKNESS—CONTRIBUTORY NEGLIGENCE.

Planks were placed along the edge of open vats in a tannery, on which employés walked. Vapors rising from the tanks would occasionally obscure the view, and, condensing, would settle on the planks, making them slippery. After plaintiff had worked about the vats for several days, he slipped, and fell into one of them, while attempting to cross the planks before daylight, and in vapors so dense that he was compelled to feel his way. His employer had informed him that any person could do the work, but that he must be careful. He was placed under a boss who spoke very imperfect English, and plaintiff could not understand his explanations, but made

no complaint thereof. *Held*, that plaintiff was chargeable with knowledge of the dangers of his employment, and his attempt to cross the planks in darkness was such contributory negligence as to bar a recovery.

Error to Kent; Adsit, J.   Submitted June 5, 1900. Decided July 3, 1900.

Case by Florian D. Shippey against the Grand Rapids Leather Company for personal injuries.   From a judgment for plaintiff, defendant brings error.   Reversed.

*Bundy & Travis*, for appellant.

*Jamison & Ferguson*, for appellee.

MOORE, J.   The plaintiff recovered a judgment against defendant because of injuries received while in its employ. From that judgment the case is brought here by writ of error.

The defendant is engaged in the business of tanning hides.   Among other buildings used by defendant is a one-story building known as a "leach-house," in which the hemlock bark is leached in vats for the purpose of getting a liquid used in the tanning process.   In this house were two rows of leach-tanks, six in each row. The tanks were 8 feet high and 14 feet in diameter.   The tanks in the row were about one foot apart, and the two rows were a little farther apart.   Between the two rows of tanks were the liquor logs.   Reaching into the tanks were steam-pipes, and, by turning a valve, the steam would be let into the bottom of the tanks, and, if continued long enough, would boil the liquid and cause it to splutter, so that some of the bark would be thrown up, lodging on the running-boards over the tanks. Over the middle of each row of tanks was a running-board, made of planks, about 20 inches wide, and on the sides of the building, just outside of the tanks, was a platform 30 or 35 inches wide.   There was also a running-board between each pair of tanks.   There were no rails to

any of these running-boards, and, with the exceptions named, the tanks were all open at the top. One, and sometimes two, of the tanks would be boiled at a time, and, when the boiling was going on, would throw off steam. The building was lighted with windows above the tanks. After the contents of a tank had been sufficiently cooked, the liquor would be drawn off, and, after the leached bark was sufficiently cooled, a plug would be pulled, and the bark would be pitchèd to a conveyor or elevator, and conveyed to the engine-room, where it was used for fuel. The pitching of this bark is called "pitching leaches." The tops of the tanks were reached by a stairway, the head of the stairs being near the end of the running-board over the first row of tanks. After coming up the stairs, if one turned abruptly to the right, and followed a running-board, he would reach the platform running along the side of the building, and parallel with the outside of the first row of tanks. About halfway between the head of the stairway and the platform at the side of the building was a post, which had the effect of narrowing the platform to about 20 inches in width.

The plaintiff is about 30 years old, a man of fair intelligence, who had worked on a farm, and had worked at stave-jointing for about 8 years. He had no experience in a tannery. He entered into the employment of the defendant, and worked for a week, loading bark on cars and doing various kinds of work about the yard. At the end of this week he engaged with Mr. Metz, president of the company, to commence pitching leaches on Monday. He was told:

"Anybody can do the work. Miller will show you what to do,—all about it; and the main thing is, if you work in there, you want to be careful, because you work on boiling hot leaches."

On the following Monday he reported to Mr. Miller, who is a German, who speaks English somewhat imperfectly, and was set to work. He claims he could not understand Mr. Miller very well, though there is nothing to indicate

that he so informed Mr. Miller. The substance of the testimony of Mr. Shippey is as follows:

"On this Monday morning I went to the engine-room in the morning, and Mr. Miller motioned me to go and wheel coal to the engine-room. I could not understand his language very well, but, by motions, I understood that I was to wheel in the coal. I wheeled coal until, possibly, 8 o'clock. Then Mr. Miller took me up into the leach-house. I could not understand him. He showed me how to pull the plug and pitch the leach. We went to the head of the stairs, and he was talking in German, and told me to follow him, or words to that effect, and I turned to the right, passed over to the first leach, and came across between the leaches, and came to the third leach from the east end on the south side; and he fastened a chain on the lever and on the plug, and told me to pull it. I tried to pull it, and could not, and he got a bar or maul, and pounded the plug and loosened it. Then he helped me, and we took the plug out. Then he took a shovel or fork, and showed me how to pitch it out into that hole. The hole was in the bottom of the leach. * * * After I got the work done, I went to the engine-room, and Mr. Miller told me that, when I heard the elevator, it was a sign he wanted bark up in the engine-room; * * * that was a signal for me to pitch leach.

"On Monday morning, when I went up in there, I couldn't see much of anything only the vats steaming very little to the side that I was on. I think the steam was escaping from the building. As you go up the stairway, there is a large post at the right side of the building, —the north side. Passing into the building, there is a post, probably a foot square, that is set into the wall, and the platform is very narrow where it goes through from over the leach there, — possibly 17 inches; maybe more. After you pass that, the platform is wider until it comes to the second leach. These planks are built right on top of the leach or vat, and there are planks across the center. The post is very close to the landing as you go up the stairs, because, turning to the right, you could place your hand on the post. Between the post and the open vat the plank was very narrow, and then the platform widened after it passed the post. Between the post and the outer wall of the building and the vat, I should think the width of the plank would not exceed 40 inches. Planks are placed over the center, possibly about 10-inch

plank; otherwise, vats are open.  There is nothing to
protect a man from falling in.  There were no explana-
tions or warnings given me about danger at the time I
was set to work.  I do not understand German.  I could
not understand Miller only by motions.  When he would
say anything, he would go through with the motions.  I
could not understand his language, but by motions of his
hands, and the way he did the work, he showed me how
to do the work.  If he said anything about looking out
for this, that, or the other, I couldn't understand him.
Nobody else gave me any explanations of the dangers
there.  I thought the work had been assigned to others,
and that I was as capable of doing it as well as others.
It appeared to me that I could do it safely as well as
others.  I afterwards saw conditions, while I worked
there, which did not exist when I was set to work,—the
dense fog, the slippery condition of the platform, and the
deposits of bark.  *  *  *

"On Saturday morning I went up the stairs, turned to
the right, placed my hand on the post passing the narrow
spot in the platform, turned, swayed to the right towards
the wall, and stepped on something that pitched me head-
long towards the leach.  Would have gone in head fore-
most had it not been for throwing myself sidewise, and
struck my side on the platform, and rolled into the leach.
Gaining strength, I got out, and went to the window that
was open there.  I had never seen the bark boil over.  I
do not know what I stepped upon.  I can't tell what it
was.  I lost— I slipped or stumbled.  It was all done so
quick that I couldn't tell what it was.  My feet went out
from under me.

"Q.  What caused that?

"A.  I don't know what it was.  Something had been
placed there.  It must have been some slippery substance.
I never understood fully about the action of steam and
condensing and dropping.  The steam was more dense
that morning.  The weather was cold.  I had not encoun-
tered the slippery condition and density of the steam prior
to the morning of the accident.  *  *  *  I was passing
up there in the leach-house that morning, going to my
work of pitching leaches.  The elevator had started.  It
appeared to me that the side was the safer course, so,
rather than crossing the center plank, because the center
plank was narrower.  I was going to the south side of the
building; had to pass the first leach, and to go, I think,

the fourth leach below the end from the east of the south side. That was the vat I was working in. I don't know which of the vats were hot when I first went there. The vat into which I fell was boiling the night before the accident. I saw nothing of any deposit of any kind lying about there upon the planks the night before. I had passed over this point the night before. When I slipped, it was immediately after I had passed the post. I did not have hold of the post. There are no lights in that building, and I did not carry any light of any kind. The room is not lighted, only by lantern, if any. It was not lighted that morning. There are windows on the sides; no artificial lights. Nothing had been said to me about a lantern, or any provided for me. I learned, the morning of the 26th, that it was dark and the plank slippery, and that something was placed upon the planks that I took my tumble. The steam was denser and thicker. The morning that I went to work there was nothing in the way that would be slippery, that I could see or found. What caused me to fall in was the slippery condition of the affair that I slipped on. Had I not have slipped on it, I would not have fallen in.   *   *   *

"Q. What other condition existed that morning that did not exist when you went to work, and prior to the accident?

"A. The conditions of the fog and the slippery condition that I found. By fog I mean 'condensed steam.'"

On the cross-examination he said:

"I had never been in the leach-house prior to being set to work there. The engine-room is just to the east of it. I had been to the engine-house, and knew the doorway that went up into the leach-house.   *   *   *   The leach is a cylindrical, round tub,—vat,—probably 8 feet deep, and in that leach is the tan-bark and water. The liquor is drawn out of the leach from the bottom, and that leaves the tan-bark in a bunch, as I found it after I went to work. There was a big plug in the bottom of the leach, and, to pitch the leach, you pulled the plug and opened the opening, and then broke up the tan-bark, and dumped it out of the bottom.   *   *   *   I went up there Monday morning, and Miller went with me. I saw the room full of vats,—two rows of them the full length of the room. There was very little steam coming from any of them that morning.

"*Q.* You knew that there was hot water in some of them, or hot liquid of some kind?

"*A.* I knew there was steam of some kind; yes, sir. The leach that I pitched first was on the south side. The leach next to it must have been warm, and I knew it. I learned at that time that steam-pipes were in those vats. I found one in the leach I was pitching. I knew that that pipe was there to let steam in, and that the steam was put in to heat the liquid in the vats; and I knew that, when the steam had been put through those pipes, the liquid must necessarily become boiling hot, if kept up. * * *

"It was pretty dark those mornings at the time I went to work,—7 o'clock, sun time, or 'fast time,' as they call it. It had been pretty cold all that week, but it was colder that morning. * * *

"When I went up into the leach-house Tuesday, I went at my work, pitching the leaches. I went to work under Mr. Miller's instructions. He showed me, each time, the leach to draw. I do not remember that he took me up into the room Tuesday; he did Monday. I think it was light enough when I went up Tuesday. I did not take a lantern. I do not know that they had lanterns in the engine-room; I never asked. * * * I think I pitched but one leach Tuesday. The leach right next to it was hot, to a certain extent; it must have been; there was steam in it. I heard it boil in those vats while I was at work there. You can hear it all over the house if you are near it, and you can see it come to the surface. I do not know that the bark hangs to the surface very largely while it is cooking. I suppose it would, to a certain extent. To a certain extent, I remember that it did. I knew that the steam was in there; I could hear it. I do not know how many times I went up there Tuesday. * * * I went in and out several times every day, but I never found it so that I should stumble before. I saw all of the vats up there every day I looked. I knew every vat was open every time I went up there, and knew the building was lighted only by low windows; I do not know how many. And I knew that those vats were giving up steam. The planks on the south walk line lay right on top of the vats, projected over the vats. * * *

"Wednesday I went at my work. I do not know what time I went in the leach-house. I did not take a lantern. I do not know as anybody went with me. Mr. Miller told me which leach to take. I think Tuesday night we

drawed the plug, if I remember right, for Wednesday morning. &ast; &ast; &ast; There was no one with me only when Mr. Miller would go up there to work. The leach next to the one I was pitching must have been hot.

"I worked Thursday until noon, and we laid off for Thanksgiving. I pitched a leach that morning. I do not know what time I went to work. I did not take a lantern. No one said anything to me about a lantern, to my knowledge, or that I could understand if they did. I did not see Mr. Miller take a lantern at any time. &ast; &ast; &ast; From the 20th to the 26th of November, at half past 6 in the morning, standard time, or 7 o'clock, sun time, it is pretty dark. It was not broad daylight.

"Friday I pitched leaches. &ast; &ast; &ast; I pitched one leach. The leach next to it must have been hot; steam arising from it. I do not remember as I took notice of its boiling. I knew steam was running in through a large pipe. &ast; &ast; &ast; I think there were some days that I pitched a part of a leach twice a day,—in the morning and at night. &ast; &ast; &ast;

"Saturday morning it was from five to eight minutes after 7 when I went up in there. I went up immediately after I got to the shop. &ast; &ast; &ast; I was a very little late that morning. &ast; &ast; &ast; The elevator had started. It was ordinarily dark. It was not broad daylight. When I got in the building I discovered that it was very dark. It was practically pitch dark from the dense fog,—from the dense steam. I saw steam immediately when I got in. I knew that I could not see my footway at all. I could not see my footway a particle. &ast; &ast; &ast;

"I worked in a stave-mill eight years. They steamed their bolts and jointed. I worked all the way from a quarter to a mile from the steam-chest. I was not at the mill very often. I knew they steamed bolts. I commenced work when I was 17. &ast; &ast; &ast;

"When I started off the head of the stairs, I had literally to feel my way. I don't know what I did when I found I was in the hot water; I do not remember. &ast; &ast; &ast; As soon as I climbed out of the vat, I went immediately to the window, examined and cooled my burns as much as I could, started immediately down stairs, and went into the engine-house. I did not stop to examine the planks at that time after I fell in. I do not know what I stepped on, only it was something slippery that throwed me. I do not know what it was; I did not stop to examine. At the time I fell in, I could not see my feet or the planks."

We have quoted at length from this testimony to show just what the plaintiff claims. It is the claim of the defendant that a verdict should have been directed in its favor—*First*, because plaintiff was guilty of contributory negligence; and, *second*, because he must be presumed, after several days' employment, to be so familiar with the situation and its dangers that, if he continued in the employment, he assumed the risks incident to the business. Taking the version given by the plaintiff, we think it must be said that his conduct was not that of an ordinarily prudent man. He knew about these open tanks, in some of which there was boiling liquid. He knew about the running-boards and their location, and that they were without railings. He knew the tanks gave off steam, which would, in cold weather, condense, and be deposited upon the planks. He must have known that a misstep might result in a very serious accident; and yet, knowing the situation, he attempted to get about among these open tanks at a time when he says it was pitch dark,—so dark that he could not see his feet nor the planks. If this is not a case of contributory negligence, it is difficult to conceive of one. *Village of Momence* v. *Kendall*, 14 Bradw. 229; *Taylor* v. *Manufacturing Co.*, 140 Mass. 150 (3 N. E. 21); Deer. Neg. § 210; Beach, Contrib. Neg. § 35; Bailey, Mast. Liab. 159; *Michigan Central R. Co.* v. *Coleman*, 28 Mich. 440; *Mynning* v. *Railroad Co.*, 67 Mich. 677 (35 N. W. 811); *Melzer* v. *Car Co.*, 76 Mich. 94 (42 N. W. 1078); *Fisher* v. *Railway Co.*, 77 Mich. 546 (43 N. W. 926); *Brown* v. *Gilchrist*, 80 Mich. 56 (45 N. W. 82, 20 Am. St. Rep. 496); *Wheeler* v. *Berry*, 95 Mich. 250 (54 N. W. 876); *Soderstrom* v. *Lumber Co.*, 114 Mich. 83 (72 N. W. 13); *La Pontney* v. *Cartage Co.*, 116 Mich. 514 (74 N. W. 712). The accident was a deplorable one, and greatly to be regretted; but it is not one for which the employer should respond in damages.

The judgment is reversed, and no new trial ordered.

The other Justices concurred.