RISKU *v.* IRON CLIFFS CO.

1. MASTER AND SERVANT—SAFE PLACE—SCAFFOLDING—MINES AND MINING.

A miner, engaged in timbering a new shaft in a mine, in preparation for the ordinary operations of the business, may not recover for injuries sustained from the breaking of a staging or scaffolding on which he was at work, on the theory that the master owed him a duty to provide a safe place to work, since that doctrine does not apply while construction work is in progress.

2. SAME—FURNISHING PROPER MATERIALS—SCAFFOLDING.

In furnishing plank to construct a platform on which the men so engaged could work, the employer owed a positive duty to furnish material of a kind reasonably fit for the purpose which it was intended to serve.

3. SAME—TIMBER—SAFE MATERIALS.

If planks furnished were of a species of wood which, by its very nature, was unfit for such purpose, having reference to defendant's usual plan of construction, and plaintiff did not know of the unsuitability, he could recover for injuries caused by the breaking of defective material.

4. SAME.

But if the timber was suitable in kind, and sufficient sound material was supplied for the purpose, defendant would not be liable for mistakes or negligence of its employés in selecting it, since they were fellow-servants with plaintiff.[1]

5. SAME.

*Held,* that the evidence of incompetency of plaintiff's fellow-servants was insufficient to raise a question of fact.

Error to Marquette; Cooper, J., presiding. Submitted October 18, 1910. (Docket No. 78.) Decided December 7, 1910.

Case by Solomon Risku against the Iron Cliffs Com-

[1]As to duty of master to furnish safe appliances as affected by fact that defective appliances are prepared by fellow-servants, see note to *Haskell* v. *Cape Ann Anchor Works* (Mass.), 4 L. R. A. (N. S.) 220.

pany for personal injuries.   A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error.   Reversed.

*P. H. O'Brien* (*C. F. Button*, of counsel), for appellant.

*William P. Belden*, for appellee.

Blair, J.   Plaintiff brings this action to recover damages for personal injuries received in consequence of the giving way of a platform upon which he was working in one of the shafts in defendant's mine.   The shaft had been excavated from the seventh level to the eighth level, and defendant's employés were engaged in timbering this new excavation, working upwards from the eighth level.   The timbering was accomplished by placing sets of timbers one on top of another to form the sides and filling in behind these timbers with earth and rock to make the walls of the shaft solid.   At about 12 feet from the bottom, and at intervals of 5 feet thereafter, it became necessary to build temporary platforms upon which the shovelers could stand.   The material for filling was hoisted from the bottom in a bucket holding about half a ton, which was dumped, when about six inches above the platform, onto the platform.   When the space behind the timbers was filled level with the platform, it was removed, additional timber sets put in, the platform put in place, and the work proceeded with as before.   The shaft was divided into two compartments by dividing timbers across the middle of the shaft.   The temporary platform was constructed by laying one hemlock plank 7 feet long, 8 to 12 inches wide, and 3 inches thick, at each side from the dividing timber to the wall timber, and upon these joists, as they are called in the record, three-inch hemlock planks were laid lengthwise so as to entirely cover the space in the shaft on the side where plaintiff was working.   On the other side, a space was left through which the bucket was hoisted.   The same planks were used in constructing

the platform up to the time of the accident. The timbering, boarding of the platform, and filling the bucket were done by the miners who excavated the new part of the shaft. They were instructed how to build the platform by the timber boss:

"The planks that we did that with were lowered from the surface. They were all there at the time when he showed us. We built the stagings that way right along then. We built them out of the same planks right along. * * * When that staging was built, the first time it was built out of new fresh plank."

Mr. Carlson, the underground foreman, testified:

"I had charge of the work at these two shafts on the shift that I was working on. That is right. They did not have any underground foreman on the other shift opposite to me. I worked day shift all the time. The timber boss in the shaft where Risku was working, his name was Harry Ware, I think. As to who the other timber boss was, we had only one timberman. Timber boss was over both shafts. When they were timbering that shaft, he was staying there right along. He has full charge of timbering the shaft, full charge of that work. I think he generally used to select the timber. As to it being his duty to select the plank for the staging, well, I believe he did. * * * The next boss over me was Captain Stevens. * * * He was the captain of the mine. As captain of the mine he was to hire and discharge men. Yes, hired men. To work in the mine. He could tell the men where to go, and I had a right to tell them where to go too, on the day shift. And when Captain Stevens wasn't there I had full charge, I think so. * * * The timber boss was looking after the timber work in the mine. He had full charge of the timber work, and he was the one whose duty it was to lay out a plan for the timbering of the mine and to lay out a plan for building the stagings. When I went down there, I saw those stagings then that the men used to work on, when they filled in behind the timbers. I did pay attention to how they were built. I did pay attention to it, but I left that work to the timbermen mostly. Mr. Ware was our timberman. He was there at that time. And he would show these men that were working in the shaft how to put that timber together and how to build their staging. And they

would build it after the plan that he would lay out. That is true; yes, sir. The men working as miners in the shaft, when they were laying those timbers, they were supposed to lay the timbers the way the timber boss directed them.

"*Q.* And they were supposed to build the staging the way the timber boss directed it to be built?

"*A.* When he was there. He told them how to build it, so they would follow his directions whether he was there or not; that is right. We always built the staging in that mine for working in the shaft in the same way.',

There was testimony tending to show that the men were ignorant of platform building and of the characteristics of timber. The men had been timbering the shaft for over a week and had got 30 or 40 feet from the bottom when plaintiff was sent by Mr. Carlson to shovel the rock and earth from the platform, which had been constructed before he began work upon it. After he had worked for a few hours, one of the joists broke, and he was precipitated to the bottom, receiving serious injuries.

" It was one of the joists that broke, closer to the other end, closer to one end than the other. The break was in on a bevel. In a bevel just a little bit. Not exactly across. It was a little bit beveled. A little bit slanting (like he holds his hand). The plank was crossgrained. The plank was soft wood. I don't know the name of it, how to call that wood. In Finnish we would call it hemlock."

There was testimony tending to show that hemlock was not a proper or safe wood to be used where only a single three-inch plank was used for joists, and that a platform constructed as this was constructed was not a safe platform for the purpose for which it was to be used. Defendant had judgment upon an instructed verdict, to review which plaintiff prosecutes this writ of error.

As stated in the brief for appellant, the questions involved may properly be divided into five main subjects: (1) Safe place, involving fellow-servant question; (2) improper plan of construction of the staging; (3) failure to supply suitable material; (4) incompetent fellow-servants to build the stagings; (5) assumption of the risk.

1. The men constructing the new shaft, whether in excavating or timbering it, were engaged in preparing a place in which the ordinary operations of the mine would be carried on and the use of the platform, or staging, was a mere incident to the construction of such shaft. While the shaft was in process of construction, the doctrine of safe place would not apply; after it was constructed, it would apply. *Landowski* v. *Chapoton,* 137 Mich. 429 (100 N. W. 564), and cases cited.

2, 3. We consider 2 and 3 together. In furnishing plank for the platform, the defendant owed to the employés the positive duty of furnishing material of a kind reasonably fit for the purpose for which it was to be used. *Hoar* v. *Merritt,* 62 Mich. 386 (29 N. W. 15); *Brown* v. *Gilchrist,* 80 Mich. 56 (45 N. W. 82, 20 Am. St. Rep. 496); *Carnell* v. *Halpin,* 159 Mich. 42 (123 N. W. 578); *Lafayette Bridge Co.* v. *Olsen,* 108 Fed. 335, 47 C. C. A. 367 (54 L. R. A. 33). If the planks furnished were of a species of wood which by its very nature was unfit for the purpose for which it was used, having reference to defendant's usual plan of construction, of which unfitness plaintiff was unaware, he was entitled to recover. If, however, the timber furnished was of a suitable species, and sufficient sound planks were furnished, the defendant would not be liable for mistakes or negligence in selection, since the employés making such selection would be fellow-servants of the plaintiff. *Beesley* v. *Wheeler & Co.,* 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266).

4. We do not find sufficient evidence of the incompetency of the men constructing the platform to warrant the submission of the question to the jury.

The judgment is reversed, and a new trial granted.

HOOKER, MOORE, MCALVAY, and BROOKE, JJ., concurred.