BENSON *v.* JONES & LAUGHLIN ORE CO.

1. MASTER AND SERVANT —SAFE PLACE — MINES — NON-DELEGABLE DUTY.

Several miners in defendant's employ were engaged in work upon a platform which had been constructed in a new shaft in which plaintiff claimed to have been injured, while he was employed at his work as a pumpman, by the fall of certain rock upon him.   He produced evidence tending to show that he heard sounds indicating the descent or settling of part of the shaft, and that the men gave signals but could not get a response from the hoisting bucket, and that he tried to climb out by going up on a number of projecting bolts, and was hurt by a fall of material upon him, also that there was no bell or ladder in the shaft, and plaintiff claimed that it was the duty of the defendant to construct a safe platform upon which the men might work.   *Held*, that defendant was not relieved of its duty to render the place safe because of the rule that while a new shaft is being constructed the doctrine of safe place does not apply to employees who are working together to prepare the place of work.

2. SAME—NEGLIGENCE.

The trial court did not err in instructing the jury that defendant would be guilty of negligence for failure to provide a suitable ladder whereby plaintiff and defend·

ant's other employees might leave the shaft, or that if they found there was negligence in the failure to provide a suitable signaling system, so that a bucket might be lowered to hoist men out of the mine promptly and safely, plaintiff could recover.

3. SAME—ASSUMPTION OF RISK.
   *Held*, also, that the court erred in instructing the jury that plaintiff did not assume the risk of the danger unless he knew or ought to have known of the precise physical conditions from which the resulting injury might be expected to occur.

4. SAME—CONTRIBUTORY NEGLIGENCE.
   Where defendant claimed that the plaintiff should have gone to the surface in a bucket instead of climbing the shaft, and that he was guilty of contributory negligence for adopting the method which he used in leaving the shaft, and the testimony relating to what was said between plaintiff and his fellow workman was in conflict, the trial court did not commit reversible error in leaving to the jury the issue of contributory negligence.

5. SAME.
   Plaintiff ought not to have been permitted to recover for an injury which he sustained before he attempted to climb out of the shaft by the falling of a piece of rock that struck him between the shoulders, causing an injury which was not the proximate result of the negligence relied upon in failing to provide a safe platform and proper signaling system.

Error to Iron; O'Brien, J. Submitted January 11, 1915. (Docket No. 64.) Decided March 18, 1915.

Case by Ernest Benson against the Jones & Laughlin Ore Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*W. T. Potter*, for appellant.

*T. J. Riley* and *N. C. Spencer*, for appellee.

MOORE, J. In August, 1911, the defendant began to clear a location for iron ore operations. On December 7, 1911, it began to sink a perpendicular shaft

to reach the ore body. It was necessary to sink the shaft to a depth of 175 feet before starting the first level. The plaintiff began work as a pumpman in the shaft about February 1, 1912. He claims to have been injured about February 14, 1912, while trying to climb out of the shaft. It is to recover damages for these injuries that he brought this suit. The plaintiff was a miner of about 14 years' experience in Iron and Gogebic counties, and during that time had assisted in sinking about half a dozen shafts. The construction of the shaft began by laying on the earth four hanging pieces from 30 to 40 feet long, and from 2 to 2½ feet square; two running at right angles with the other two, which formed an opening 10 feet by 12 feet. Under the long timbers, and close to them, are bolted one set of timbers 12 inches square. The sets were 4 feet apart in the clear. As the shaft was being sunk, as soon as there was room a set would be put in and fastened by hanging bolts. On the back of these 12-inch timbers 2-inch strips were nailed. On these strips were placed back lath, almost 5 feet in length, which are 2-inch tamarack plank, to keep the earth from falling into the shaft, and in order to keep the back lath in place blocking and wedges were used to make the back lath as tight as possible. It was the duty of the men working in the shaft to keep constant watch of the shaft, and, when there was any indication of caving behind the back lath, to make immediate investigation and block or wedge the back lath whenever they were found to be loose. When the shaft reached the quicksand, at a depth of about 55 feet, water began to accumulate, and it was necessary to install a pump, which was placed on a platform on the east end of the shaft. The plaintiff helped install this pump. The pump was on a platform. As the shaft was sunk, the suction to the pump would become too short and the platform would be lowered. Until the

bearing pieces were put in at 97 feet, there was no ladder road in the shaft. The plaintiff describes a ladder road as follows:

"It is made of wood and put in straight up and down and is fastened with staples or nails and runs from the surface down to the bottom."

There was no bell line in the shaft, but there were means of signaling the engineer from the tube by striking three raps on the tube. The plaintiff had worked in the shaft 14 days and knew there was no ladderway or bell line in the shaft. On February 14, 1912, the shaft was about 90 feet deep. The entire weight of the shaft at that time was upon the hanging bolts. On that day the men had blasted. Plaintiff heard a noise that indicated the shaft was settling. Water and sand were coming into the shaft from behind the timbers. A chunk of some kind fell and hit the plaintiff, and it indicated to him the shaft was settling. Two men besides the plaintiff were in the shaft. They hallooed for the hoist. They attracted no one's attention. When the plaintiff failed to attract any one's attention, he started to climb the hanging bolts and climbed about 13 sets.

It is claimed by defendant that Samuel Truscott, a miner, was going down in the bucket and was about 35 feet from the surface when the cave-in occurred, and as the plaintiff started to climb the hanging bolts he told him to stop and take the bucket and ride, and plaintiff answered: "No, I am going to climb the hanging bolts; I can beat you up then." This is not admitted by the plaintiff. Truscott went to the bottom of the shaft in the bucket and brought the other two men up with him, and the plaintiff rode to the surface with him. A careful inspection of the entire shaft was made at once, and nothing wrong whatever was found, except a cave-in about 25 feet below the surface. The timber had just settled about an inch

around the shaft.  The plaintiff claims to have been injured by the chunk which fell and hit him before he started to climb the hanging bolts, and also by reason of climbing the hanging bolts.  The extent of his injuries was in dispute.  He claimed they were permanent and serious, and defendant claimed that at most they were only trivial.  From a judgment in his favor, the case is brought here by writ of error.

The defendant contends it is not liable for the following reasons:

(1) That no negligence was shown on the part of the defendant, and the court should have directed a verdict for defendant.

(2) That this shaft, in course of construction, was not a permanent place so that the doctrine of safe place applied.

(3) That the plaintiff assumed the risk of the absence of a ladder road and bell line.

(4) That the plaintiff was guilty of contributory negligence.

(5) That there was no evidence tending to show lack of inspection.

The first two reasons  may be discussed together. The plaintiff, who was an experienced miner, states that it was the custom in Iron and Gogebic counties to provide ladder roads where shafts are being sunk. Counsel say this evidence is too indefinite to be of any value for the reason that the plaintiff does not claim that the material through which the other shafts were sunk was similar to this one, or that any of the conditions were similar.  Counsel also lays great stress upon the proposition that this shaft, in course of construction, was not a permanent place, so that the doctrine of safe place does not apply.  It is the contention of the attorney for defendant that, up to and for some time after plaintiff's alleged injuries, all work at this location was  solely construction work, and, if we understand his argument, it is that while the work is in that condition liability cannot arise.

This court has held, in *Risku* v. *Iron Cliffs Co.,* 163 Mich. 523 (128 N. W. 747):

"The men constructing the new shaft, whether in excavating or timbering it, were engaged in preparing a place in which the ordinary operations of the mine would be carried on, and the use of the platform, or staging, was a mere incident to the construction of such shaft. While the shaft was in process of construction, the doctrine of safe place would not apply; after it was constructed, it would apply."

But in that case it was held the master owed a duty to furnish suitable material to construct a safe platform upon which the men were to work. Other cases where the doctrine of safe place was considered by this court are *Livingstone* v. *Plate Glass Co.,* 146 Mich. 236 (109 N. W. 431); *Dunn* v. *Dredge & Dock Co.,* 161 Mich. 551 (126 N. W. 833); *Kaaro* v. *Mining Co.,* 178 Mich., at page 681 (146 N. W. 149); and the cases there cited.

We do not understand that any of them hold, because the work is construction work, that the employer would be relieved of liability for all kinds of negligence.

The trial judge eliminated the question of safe place and instructed the jury that:

"The case must be decided upon the question whether or not the defendant was negligent in failing to furnish a suitable ladder by means of which the plaintiff could get out of the shaft promptly, in case of an emergency, and also whether there was any negligence on the part of the defendant in its failure to furnish a proper and suitable signaling system from the bottom of the shaft or from points in the shaft, so that the bucket could be promptly lowered or hoisted in case of emergency where a man would be required to get out of the shaft quickly in order to be reasonably safe.

"Now, it is the claim of the plaintiff in this case that the defendant was negligent in failing to furnish such a ladder, and also in the failure to furnish such

a bell system or signaling system.   On the other hand, the defendant denies any liability, denies that it was guilty of any negligence, and alleges that the injury was caused to the plaintiff, if he was hurt at all, by reason of his own negligence, and also that he assumed the risk of the particular injury which he claims he suffered on the 14th day of February, 1912."

They were instructed that unless there was negligence in that regard there could be no recovery.   We think there was no error in this instruction.

3. It is claimed the plaintiff assumed the risk of the absence of a ladder road and bell line.   This claim is based upon what plaintiff saw or should have seen during the days he was employed in the shaft.   In this connection it must not be forgotten that plaintiff was not engaged in the actual construction work of the shaft, but that his duties were as pumpman, and that the work of sinking the shaft began two months before he began his work.

The judge charged the jury upon the subject of assumed risk in part as follows:

"I charge you that the plaintiff, in entering the employ of the defendant and engaging in the work of sinking said shaft, voluntarily assumed all the obvious risks and dangers ordinarily incident to such mining work; that it was his duty to familiarize himself with the imminence of the danger, and he is taken to have assumed all the ordinary risks which were incidental to the work of sinking the shaft which he actually knew about, and also such risks which an average man, using ordinary prudence and care in the performance of such work, would be bound to learn and know of as the result of doing such work.   If you find that his injury resulted from any such obvious or usual risk or danger, then it is your duty to render a verdict for the defendant.   *   *   *

"I charge you, gentlemen, in addition to that, first on the question of assumption of risk, that, while it is true that an employee assumes all ordinary and obvious risks of a service, he does not assume any risk except those which are either known to him or

would become familiar to him in the ordinary performance of his work. If any risk arises out of an unusual situation, he will not assume that risk, unless he knows, or ought to know, the precise physical conditions from which the risk would ordinarily arise."

There was more of the charge upon this phase of the case, but it is not claimed the rest is error, if that feature of the case was to be submitted to the jury. The doctrine of assumed risk has been frequently before this court. Two of the leading cases are *Bradburn* v. *Railroad Co.*, 134 Mich. 575 (96 N. W. 929), and *De Kallands* v. *Telephone Co.*, 153 Mich. 25 (116 N. W. 564, 15 Am. & Eng. Ann. Cas. 593). These cases are so recent and so accessible that we content ourselves by referring to them. The charge of the trial court in the main was a correct statement of the doctrine of assumed risk, but we think the statement, "if any risk arises out of an unusual situation, he will not assume that risk, unless he knows, or ought to know, the precise physical conditions from which the risk would ordinarily arise," was a modification of the doctrine not warranted by the authorities.

4. Was the plaintiff guilty of contributory negligence so that it could be said as a matter of law that he could not recover? This contention seems to be based upon the claim of what was said between the miner who was going down in the bucket, and the plaintiff. There is a disagreement about what was said, and we think this presented a question for the jury.

The court charged upon this feature of the case as follows:

"And the last remaining question would be the question of contributory negligence. The only claim there can possibly be that the plaintiff was guilty of contributory negligence would be his failure to ride up in the bucket, if you find he had an opportunity to do so."

It is insisted this limits the field· of inquiry too much; that, in view of what really happened to those in the bottom of the shaft, and the conditions surrounding the entire occurrence, it should have been left to the jury to say whether in climbing the shaft plaintiff did what a reasonably prudent man would do.˙ We think there is force in this contention.

It is said the court committed error in his charge in relation to the measure of damages:

"Upon that question I charge you that the plaintiff is entitled to recover the actual damages which he has suffered by reason of his injuries. It is not admitted ·by the defendant that he suffered any injury at all. That will be one of the questions of fact for you to determine. If you find he was injured, you will have to determine the extent of his injuries. The plaintiff is also entitled to recover the loss of his earnings as the result of the injury. He is entitled to recover for all the pain and suffering which he has endured as the result of the injury, if any.  *  *  *  So that matter is for you to determine. You have a right to take into account all his injuries, to consider all the evidence offered before you."

In this connection, it must be remembered the only question of negligence submitted to the jury by the judge was the failure to construct the ladder road and the bell line.

The plaintiff testified:

"I did not receive all my injury that night by climbing upon the hanging bolts. The first injury I got from that chunk was between my shoulders. I don't know what it was. I didn't see it. It struck me right between the shoulders, just under the collar bone. I couldn't say how large a chunk it was. It made me sore. I got over it a year ago. It did not break the skin. It broke something inside. I don't know what it was. It hit me between the shoulders, right between the main neck bone, just about two inches below the base of the neck. I had my clothing on at the time. I don't know as there was anything else fell in there. That struck me before I started to climb up. I was

standing on my knees when that struck me, working at the pump.

"Q. Was that after you had heard the noise?

"A. Yes, sir; it happened at the same time.

"Q. You heard the noise and that happened?

"A. Yes, sir.

"Q. And then you immediately started to go up?

"A. No. sir; I did not.

"Q. How long did you wait?

"A. Probably about three or four minutes after.

"Q. You waited there three or four minutes before you started to go up the hanging bolts?

"A. Yes, sir."

This testimony relates to a hurt which would have been received even though the ladder road and bell line were constructed and should have been withdrawn from the jury.

We do not think the other assignments of error call for discussion.

For the reasons stated, we are constrained to reverse the case and grant a new trial.

MCALVAY, KUHN, STONE, BIRD, and STEERE, JJ., concurred with MOORE, J.

BROOKE, C. J. I concur in the result for the further reason that no negligence of defendant was made out.

OSTRANDER, J., concurred with BROOKE, C. J.