126  429
p153 ¹ 36

DAVIS v. PORT HURON ENGINE & THRESHER CO.

1. MASTER AND SERVANT—PERSONAL INJURIES — ELECTRIC WIRES —ASSUMPTION OF RISK.

A servant who, in stringing a wire for a call bell, goes upon the roof of a building over which a live electric wire is suspended, he knowing the character of such wire and the danger of contact therewith, and the roof being in a wet and slippery condition, assumes the risk of injury from slipping and coming in contact with such wire, and cannot recover for an injury so received.

2. SAME—SCOPE OF EMPLOYMENT.

An employé in a machine shop who has assisted in wiring the building for electric lights, and whose duty it is, among other things, to look after the wires and lamps, cannot be said to be acting without the scope of his employment when engaged, pursuant to the master's direction, in stringing a wire for an electric call bell from the building to a point outside

Error to St. Clair; Vance, J.   Submitted October 9, 1900.   Decided May 7, 1901.

Case by Mary Davis, administratrix of the estate of Charles Davis, deceased, against the Port Huron Engine & Thresher Company, for the alleged negligent killing of plaintiff's intestate.   From a judgment for defendant on verdict directed by the court, plaintiff brings error.   Affirmed.

*John B. McIlwain* (*O'Brien J. Atkinson*, of counsel), for appellant.

*Stevens & Graham* (*Moore & Moore*, of counsel), for appellee.

MONTGOMERY, C. J.   This action is brought to recover damages for the negligent killing of Charles Davis, January 21, 1898.   The defendant is a threshing machine

manufacturing company. Its office is located on the west side of Twenty-Fourth street, Port Huron, and its machine and foundry shops still farther west. The deceased had been employed by the defendant since June previous.

On the afternoon of January 21, 1898, Mr. Peavey, the general manager, and also secretary and treasurer, of defendant, ordered a call bell to be put into the office, to be connected with a pole at the Saxton House corner, about 250 feet or more north on Twenty-Fourth street. At this corner the street cars turned, and the object of the call bell was that parcels might be thrown off by the street-railway company on the platform at that corner, an electric button pushed, and thus notify defendant's office. The order was given to Charles Peavey, a brother of the manager, with directions to have Mr. Vanness, the general superintendent, have the work done. Mr. Vanness directed Mr. Moak, the foreman of the machine shop, to send a couple of men to do the work. Mr. Peavey says Robert Riggs, another employé, was the man who did that kind of work. Mr. Moak ordered Charles Davis, then at work as a helper, to go and find Riggs, and the two together to put in the call bell. Davis found Riggs, and informed him of the order. The two went to the storeroom, and got sufficient wire to make the circuit from the Saxton House corner to the office. Riggs fastened one end on the pole at the corner on the east side of Twenty-Fourth street, crossed over to the west side of the street, made a fastening there on another pole, and then started in a course little west of south to the point where the entrance to the office would be made. Adjoining the office on the north side was a little frame building about 20 feet high, with four gables, the south gable butting up to the office building. A direct course from the pole at the corner to the office would pass over the roof of this little building. As a guide to Riggs where to put the wire, there were four or five telegraph and telephone wires stretched from this same pole to the office, passing over and fastened to the roof of this small building, and

from there entering the office; so this course was one well defined, and one long recognized and used by defendant, and no wires from this corner to the office went in any other direction. At that time there were also passing over the roof of this small building, in an east and west course, two electric light wires, carrying a current of 1,040 volts, a ground connection with which would be almost certainly instant death. The latter wires passed from 18 inches to 2 feet above the peak of the roof, being attached to a pole still farther west, on which was a transformer, where the current was reduced before passing into the buildings.

After fastening the wire on the pole at the corner, the two proceeded towards the office — Davis carrying the ladder, and Riggs the coil of wire — on the same line as the wires already there, and the ladder was placed at the north side of the east and west gable of the little frame building, intending to fasten the wire onto the roof, and from there extend it into the office, it being necessary to fasten it on the outside to take off the strain and enter the office. It was a wet time of the year, a wet day, and the building as well as the ground was wet. Riggs gave Davis the loop of the wire, the coil being on Riggs' arm, and Davis ascended the ladder, got up on the roof, crawled under the electric wires, pulling the wire he was stringing after him, and got onto the south side of the east and west gable. He was seen, by the only witness who saw the occurrence, as far as this record shows, to approach the ridge of the gable running east and west, and, as he got nearly to the electric wire, he held out his hand, and tested it, as if seeking to determine whether there was electricity in it or not. He crawled under that wire, and, while he was between the two wires and on the ridge board, he tested the south wire in the same way, and then slid down under the south wire some five or six feet, and rose to his feet, still holding the small wire in his hand. He then attempted to walk westerly on the south side of the east and west gable, and as he did so he seems to

have slipped, as the testimony puts it, and, either to save himself from falling or thoughtlessly, he took hold of the electric wire with his hand. In the other hand he held the bell wire, the coil of which Riggs had on his arm standing on the ground, which formed a complete ground connection. The electric current passed from the wire through his arm and body, and down this wire into the ground, and killed him instantly.

The circuit judge directed a verdict for the defendant, and plaintiff brings error.

Deceased knew that live wires were dangerous; that, if he came in contact with a live wire, it would be likely to cause injury. He knew the slippery condition of the roof, and knew as well as his employer that, if he lost his footing while on the roof, an involuntary movement might bring him in contact with the wire. He must be held to have assumed the risk. The case is unlike *Smith* v. *Car Works*, 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542), which holds that, when a servant is engaged in a hazardous work in which the danger is not apparent, it is the duty of the master to warn the servant of the concealed danger, its nature and extent. The doctrine of this case is not questioned, and it has since been followed. *Fox* v. *Color Works*, 84 Mich. 676 (48 N. W. 203); *Ribich* v. *Smelting Co.*, 123 Mich. 401 (82 N. W. 279, 81 Am. St. Rep. 215). In each of these cases the injured party was ignorant of any danger of injury. In none of them was it held that it is the duty of the master to foretell the exact extent of the injury likely to follow on the neglect of the warning of danger. This is never precisely known in the case of an obvious danger. If deceased knew that contact with this wire would cause him severe injury, he had sufficient warning. This was all the most expert could have known in advance, and there can be no doubt on this record that deceased knew this.

The service was not outside the employment of deceased. The circuit judge, in his charge, correctly summarized the evidence on this point, as follows:

"I understand this testimony to show that Mr. Davis had been employed there in the engine and thresher company's works as an employé in the machine shop, from about June, 1897, until the time of his death, January 21, 1898; that he was a bright, active, intelligent, energetic, and industrious man; that some time along in the fall — something over two months prior to his death — the superintendent, under the direction of the general manager, selected him as a man that they would like to have take some interest and become acquainted with the wiring of the building for electric lights, and to look after and care for the wires and electric lights.   It seems they had a man by the name of Riggs that had done that work for some time, but he was absent on other work at times, and the object was to get Davis acquainted with that work, so that he might take Riggs' place in his absence, or take his place doing that work when Riggs was otherwise engaged. The superintendent had a talk with Davis with reference to the matter, and he expressed himself as willing to take an interest in it.   They were then about to wire the shops, and he was sent, with Riggs, to assist the electrician in wiring the shops, and was occupied in that some two months.   From that time until the time of his death, whatever was to be done around there in the way of wiring or looking after the lamps, if anything, either he or Riggs did it, according as they might be sent, or as one or the other might be engaged in other matters."

It cannot be said that the stretching of this wire was, in view of this engagement, outside the scope of Mr. Davis' employment.   True, it was not his sole employment, but it was in line with what he had engaged to do.   Granting that it was the duty of defendant to inform deceased of any latent danger, when it appears that, through Riggs and defendant's agent Hutchins, the deceased had been informed of the dangerous character of live wires, and that these wires were open to observation, and actually seen by him, this duty was performed.

Judgment affirmed.

The other Justices concurred.