DE KALLANDS v. WASHTENAW HOME TELEPHONE CO.

1. MASTER AND SERVANT — PERSONAL INJURIES—NEGLIGENCE OF MASTER—QUESTION FOR JURY.

In an action by the employé of a telephone company for personal injuries, evidence examined, and *held*, that whether it was the duty of the company to have furnished plaintiff with a sufficient quantity of insulated wire, and whether it discharged that duty, were questions for the jury.[1]

2. SAME—FELLOW-SERVANTS—CONCURRING NEGLIGENCE OF MASTER.

An employé may recover for the negligence of his employer, although the negligence of a fellow-servant contributed to the injury.

3. SAME—METHOD OF WORK — NEGLIGENCE OF SERVANT — QUESTION FOR JURY.

In an action by the employé of a telephone company for personal injuries, *held*, under the evidence, to be a question for

[1] As to liability of electric company to employé injured by shock, see note to *Western Union Tel. Co.* v. *McMullen* (N. J.), 32 L. R. A. 351.

the jury whether the plaintiff's method of drawing two wires across certain other highly charged wires at once was more unsafe than to draw them one at a time.

4. SAME—PROXIMATE CAUSE OF INJURY.

Where, in an action by the employé of a telephone company for personal injuries, there was evidence from which the jury might have found that the defendant was negligent in not furnishing plaintiff with a sufficient quantity of insulated wire, and plaintiff's injuries were caused by another employé allowing the wires they were stringing to sag and come in contact with a trolley wire over which they were crossing, it was not error to refuse to direct a verdict for defendant on the ground that the uninsulated wire was not the proximate cause of the injury.

5. SAME—ASSUMED RISK—APPLICATION OF DOCTRINE.

The doctrine of assumed risk applies, and is limited in its application, to dangers which the employé either actually knows or should know.

6. SAME—IGNORANCE OF DANGERS—EFFECT.

Actual ignorance of the dangers of the employment will not alone suffice to relieve an employé from his assumption of the risks of the employment; the ignorance must also be excusable.

7. SAME—NEW DANGERS.

The doctrine of the assumption of obvious risks applies as well to those risks which arise or become known to the employé during the employment as to those in contemplation at the original hiring.

8. SAME—BASIS OF DOCTRINE—CONTRACT OF EMPLOYMENT.

The doctrine of the employé's assumption of the risks of his employment rests upon the contract of employment, which the law implies he accepts with all the risks incident to the employment, without regard to the magnitude of the danger.

9. EVIDENCE — JUDICIAL NOTICE—PHYSICAL CHARACTERISTICS OF OBJECTS—ELECTRICITY.

Electricity is to be classed with gunpowder, dynamite, and other dangerous and treacherous and destructive agents, of whose dangerous qualities courts take judicial notice, as well as of the fact that society recognizes them and acts accordingly.

10. MASTER AND SERVANT — ASSUMPTION OF RISK — OBVIOUS DANGERS.

It is not merely the physical surroundings of the servant that

must be obvious to him in order that he may be held to have assumed the risks arising therefrom, but it must be obvious to him, or, at least, to an ordinarily prudent servant, under the circumstances, that there is danger in such a situation.

11. SAME—DIRECTION OF VERDICT.
When there is a possible phase of a case where the risk was not assumed, the trial judge cannot properly direct a verdict on the ground that such risk was assumed.

12. SAME—TELEPHONE LINEMAN — RISK ASSUMED — QUESTION FOR JURY.
In an action by an employé of a telephone company for personal injuries received while stringing a line of wire, caused by the wire coming in contact with a trolley wire, evidence examined, and *held*, that whether plaintiff actually had knowledge of what constituted a grounding of himself or of the telephone wires, and whether he was ignorant of the fact that he was not insulated while in his position on the pole, were questions of fact for the jury.

13. SAME—IGNORANCE OF DANGER—EFFECT.
A servant employed by a telephone company as lineman cannot avoid the effect of his assumption of the obvious risks of his employment by showing his ignorance of what constitutes a grounding, and whether he was insulated while upon a pole in contact with telephone wires, since the danger from contact with highly charged wires was a characteristic risk of his employment, and it was implied in the contract of employment as lineman that he knew those things with reference to the creating of grounds and circuits which a telephone lineman must necessarily know in order to conduct his business with any degree of safety whatever to himself, his employer, or his co-employés.

14. SAME—EMPLOYER'S NEGLIGENCE.
The rule that an employé does not assume the risk of dangers arising through the negligence of his employer does not apply to cases where the negligence and the resulting danger are discovered by and known to the employé before entering upon the performance of the work; to hold otherwise would be to apply to such cases the rule which is only applicable in cases where the risk grows out of the violation by the employer of statutory provisions for safeguarding employés.

Error to Washtenaw; Kinne, J. Submitted April 13, 1908. (Docket No. 53.) Decided May 26, 1908.

Case by Valentine G. de Kallands against the Washtenaw Home Telephone Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Reversed.

*A. J. Sawyer & Son*, for appellant.

*Frank A. Stivers* and *M. J. Lehman*, for appellee.

BLAIR, J. Plaintiff brought this action to recover for injuries received by him while in the performance of his duties as a lineman in the employ of defendant in stringing wires for a telephone, which he had been directed to put in by defendant. The declaration contains one count and charges as negligence:

(1) The failure to furnish a sufficient number of competent fellow-servants.

(2) The failure to furnish properly covered or insulated copper wire.

(3) The failure to furnish suitable and proper hand lines.

(4) The failure to furnish suitable reels.

Upon the conclusion of the plaintiff's case, the defendant moved the court to direct a verdict for the defendant, which motion was denied. The motion to direct a verdict was renewed by defendant at the close of the case and again denied. Defendant also submitted requests to charge, requiring the direction of a verdict, which were refused by the court and the case was submitted to the jury upon the question whether the defendant had negligently failed to furnish insulated copper wire, the court having determined the other allegations of negligence against the plaintiff. Defendant has removed the record to this court for review upon writ of error, insisting that a verdict should have been instructed in favor of the defendant for the reasons:

(1) That the plaintiff's injuries were due to the negligence of a fellow-servant.

(2) Because the plaintiff had chosen an unsafe way of

stringing the wire when a safe way was equally open to him.

(3) That the failure to furnish insulated wire was not the proximate cause of the injury.

(4) That the plaintiff assumed the risk of the dangers due to the use of uninsulated wire.

(5) That the defendant was not guilty of negligence.

Plaintiff testified as follows as to his experience:

"I worked for the company here in the city about seven months, perhaps six or seven, and for the Bell Telephone Company for about a year altogether. That would make two years very nearly that I worked at the business, lacking a few months. I think I was at the University about three months. I did whatever I was told to do. * * *

"I worked for the Wash. Light & Power Co., too. I did what they told me to, if I could do it. I always attempted to obey orders. If I did not know, somebody quickly explained it to me. I did not always, when they told me to do anything, find out what it meant and why it was done. * * *

"I passed my degree as an apprentice, and first got my card as an apprentice, and after I had shown myself competent for the business, was given a full fledged lineman's card. I think I received that card from the hands of the union about June, 1904. I was hurt in August, 1905."

He was assisted in the work in question by a young man by the name of Werner, who had worked for the company for some time and who was, as he testified, a competent assistant.

The stringing of the wires required them to cross over an electric trolley wire and certain electric light wires.

Plaintiff testified that Mr. Spence, the wire chief of defendant company, gave him a card with the address of the place that he was to put the telephone in.

"All these companies simply give an order to put in light or telephone in such a house, or wire such a house, that is all there is to it. We have sense enough to know that we have the job in our hands, and we have to go and do it. And we take such help and material as we

please, and go and do it, if the help and material are there. We are not instructed how to climb the pole or throw the line or draw it or anything of that kind. That is part of the work that we are expected to know enough to do. * * *

"I cannot recollect who got the material for me when I got the order to put in this telephone. Henry Werner was to help me. Henry and I went and got the material, * * * and loaded it onto the wagon. * * *

"*Q.* They did not select the wire for you?

"*A.* We had to take what there was, there was none to select from. They did not select the wire.

"*Q.* You did not enter any complaint to them that there was not any such wire there as you wanted?

"*A.* I spoke about it, yes, sir.

"*Q.* To whom did you speak?

"*A.* Mr. Spence, I think.

"*Q.* What did you say to Mr. Spence?

"*A.* I simply mentioned the fact, I cannot remember the words or anything, but merely the fact that I mentioned the absence of covered wire on the day when I went over the trolley the first time, because we did not have enough that time, and I had to splice it out with bare wire in order to make the whole space between the poles.

"*Q.* Did you make any complaint to Mr. Spence that you did not have covered wire to make this connection?

"*A.* I asked for more, yes. * * *

"*Q.* Did he make you any answer at all?

"*A.* Oh, yes, but I cannot remember it. * * * I couldn't have selected the kind of wire or the proper wire, there was none other. There was nothing to select from. I took all there was, and then I told Mr. Spence that there was no copper wire and he told me to finish the job."

Plaintiff further testified:

"The pole that I went up in the first place was exactly on the corner, and I was practically stringing my wires across to the cross corners from that, diagonally, but on the other two corners were two Bell Telephone Company's poles carrying about three arms full of wires. It might be about 30 wires, something like that, and I had to cross over them and about three feet, I think about that, our wires extended perhaps higher, and then on the other side

of them, perhaps six feet out farther, these Bell wires were about 20 feet from the pole, I think, I am not sure, and about six feet on the other side of them the Light & Power Co.'s arc light wires were running parallel with those Bell wires, and beyond those were one or two guy wires that were helping to hold up these poles on the corner, and underneath all of those the trolley wire ran parallel with the street running up the hill, running right along the center of the street in the same direction with the street, and I had to throw the rope I had in the first place over the top of all these wires, because our wires were higher than any of those and I had to bring it up over everything and clear all.    *    *    *

"*Q.* You were right in there mixed up among the wires?

"*A.* Yes, not way up, but so my head and shoulders were on a level with the first armful of wires."

He knew his clothes were wet, and that damp clothes, damp weather, damp anything was more likely to attract electricity, and he knew what a live wire was, and that a wire that is charged with electricity, whether light or heavy, is a live wire, and he knew that every one of the wires he was going up among was a telephone wire and in constant use and was charged with electricity.

"*Q.* Before you commenced to string this wire on Saturday afternoon and when you got up your pole, you could see all the dangers that were there, you could see every wire, and you were above the trolley wire, you could see the electric light wire, you could see all the wires there could you not?

"*A.* Yes.

"*Q.* You knew they were there before you commenced work?

"*A.* Yes, sir.    *    *    *

"*Q.* When did you first learn that it was dangerous to cross a trolley wire with these telephone wires?

"*A.* I always understood it was dangerous to cross any highly charged electrical wires.

"*Q.* What do you mean by always understood? You mean ever since you commenced the business at all?

"*A.* Ever since I can remember I have understood it was unsafe to handle highly charged wires.

"*Q.* How long since you found out that it was danger-

ous when crossing wires that you must be careful not to touch those wires with the wires you were stringing?

"*A.* I have taken it for an understood fact, I cannot remember the date.

"*Q.* It has been an understood fact with you ever since you first commenced the business?

"*A.* Yes.

"*Q.* When you started out with your card to install this telephone you knew how to install it, did you not?

"*A.* Yes, sir. .

"*Q.* And you knew the system of crossing electric light wires and trolley wires, you knew the system by which that was done?

"*A.* Yes.   *   *   *

"*Q.* You took the chances, you knew what you had?

"*A.* Yes, I knew what boy I had, I knew what wire I had, and I knew what rope I had, and I knew the danger of crossing that wire.   *   *   *

"*Q.* You could see this danger?

"*A.* No, sir.             .

"*Q.* You could see that trolley wire?

"*A.* I could see the danger of a chance of dropping that wire.

"*Q.* You could see the danger if he did drop it?

"*A.* Yes, sir.

"*Q.* You knew if he did drop it what the result would be?

"*A.* No, sir."

Plaintiff further testified that he instructed Henry Werner to hold onto the wires:

" Explained to him that if the wires, after I had drawn them along a little ways, if they were allowed to lie loose they would go down onto the Bell wires, which we were instructed to not interfere with in any manner, and also down onto the trolley which would have, of course, spoiled our work, because it would burn our wires, and cause us to do it all over again, or spoil some of the Bell phone wires by crossing the wires; I instructed him that if any strong electric shock came through there, and he would get it by hanging onto the wires, to step back onto the tar sidewalk and he would, in my opinion, insulate himself completely, because it was a very dry, hot day; after I told him that I proceeded up the road with the end of the rope, and went to the pole with it and pulled

the rope over hand over hand in order to get the wire to me, and cautioned Henry Werner several times to be very careful, and not to let the slack of the wire down onto the trolley. I think we were about fifteen feet above it when we kept the wire up tight. * * *

"*Q.* At the time you gave the boy instructions, what had you principally in mind, what was your purpose in warning him?

"*A.* Why, I thought on account of crossing over so many wires, and the trolley wire and everything else, of course, I supposed we were running the chance of dropping it onto those wires and I thought he might get a sound or something and imagine he was badly hurt, and drop the wires and then we would have to do all the work over again, if they dropped down onto the trolley wires *and the trolley might burn our wires in two because our wires passed over the pole and onto the ground, and it would burn and ground our wires so we would have to do our work all over again, and it might spoil some of the Bell phone wires and phones.*

"*Q.* What would it do to you if that boy let those lines sag so it would strike the trolley wire, what would happen to you?

"*A.* I had no idea at that time, I thought I was well insulated by being upon this dry cedar pole.

"*Q.* You were right in there mixed up among the wires?

"*A.* Yes, not way up, but so my head and shoulders were on a level with the first armful of wires.

"*Q.* Did you know at that time how those wires were grounded?

"*A.* No. * * *

"*Q.* Did you know you were in any danger from those wires at all?

"*A.* No. I did not have the least idea."

One of defendant's experts testified that, in his judgment, plaintiff got in the most dangerous position in doing his work that he could, except to lie on the cross wires, and that unless he was trying to commit suicide, plaintiff had little apprehension of the danger that he was in, and that he should judge he was wholly incompetent to do that kind of a job or was incapable of appreciating the danger. Plaintiff also testified that this was the first tele-

phone wire he ever ran; it was the first job the company
ever gave him to take and do alone, and it was the first
time he ever went out to string a wire of any length;
never ran one as far as this; had only done this kind of
work working with other men; never had charge of a
similar job before; and had never appreciated any dan-
ger. He understood that if a wire touched the trolley
wire up in the air it would have been charged with elec-
tricity from the trolley wire, but he thought at the time if
he were insulated from the ground, he couldn't be af-
fected by electricity in the trolley wire because the other
electricity is in the rails themselves and he did not think
it could hurt him; that he did not know that there
couldn't be a live wire without its being grounded. He
did not know that if the wire touched the ground and
touched the trolley wire it was grounded and would hit
him, and had no idea that touching the ground would af-
fect him. He did not know at the time how the wires
were grounded but he learned afterwards. He learned
afterwards that they led back to the central office and
were there connected with the ground. He knew nothing
about it at the time. He did not have the least idea that
he was in any danger from those wires that touched his
body. He was ordered to have this job finished without
fail by Saturday night and had worked about a day and
a half when he was hurt, through the wire in some way
getting away from Werner, the assistant, and falling upon
the trolley wire and the ground, causing him quite serious
injuries.

5. There was an abundance of testimony to justify the
trial judge in submitting to the jury the question whether
it was the duty of defendant to have furnished the plain-
tiff with a sufficient quantity of insulated wire and
whether it discharged such duty.

1. Even if the evidence were undisputed that the wire
fell upon the trolley wire through the negligence of plain-
tiff's fellow-servant, Werner, this fact would not have
authorized the instruction of a verdict, since an employé

may recover for the negligence of his employer although the negligence of a fellow-servant contribute to the injury. *Lockwood* v. *Tennant,* 137 Mich. 305.

2. Whether the plaintiff's method of drawing two wires across at once was more unsafe than to draw them across one at a time was, upon this record, a question of fact for the jury.

3. The trial judge did not err in refusing to instruct a verdict on the ground that the uninsulated wire was not the proximate cause of the injuries. *Swick* v. *Cement Co.,* 147 Mich. 454; *Logan* v. *Railway Co.,* 148 Mich. 603; *Warren* v. *Railway Co.,* 141 Mich. 298; *Southwestern Telegraph & Telephone Co.* v. *Robinson,* 50 Fed. 810 (16 L. R. A. 545).

4. Assumed risk. This raises the really serious question in the case. The principles underlying the doctrine of assumed risk were examined at some length in *Bradburn* v. *Railroad Co.,* 134 Mich. 575. It was there said:

The doctrine of assumed risk applies, and is limited in its application, to dangers which the employé either actually knows or should know."

See, also, *Harrison* v. *Railway,* 137 Mich. 78.

In *Ragon* v. *Railway Co.,* 97 Mich. 265, it was said:

"The master has a right to expect him to be alert to inform himself of existing conditions, and he cannot attack the master from the shelter of unjustifiable ignorance of the business, machinery, and methods which he is employed to use. Actual ignorance will not alone suffice to charge a master; the ignorance must also be excusable."

In *Foley* v. *Light Co.,* 54 N. J. Law, 411, it was said:

"The immunity of the master rests upon the contract of hiring. The master says to the servant: You understand fully the nature of the employment and the danger attending it; will you enter upon it? The servant says: I accept it; and the law implies that he accepts it, with all the risks incident to it, without regard to the magnitude of the danger."

It is the general rule that the doctrine of the assumption of obvious risks applies as well to those which arise or become known to the employé during the employment as to those in contemplation at the original hiring. 26 Cyc. p. 1180; *Kean* v. *Rolling Mills*, 66 Mich. 277.

In *Warren* v. *Railway Co.*, supra, it was said:

"Electricity is to be classed with gunpowder, dynamite, and other treacherous and destructive agents, of whose dangerous qualities we may take judicial notice, as well as of the fact that society recognizes them, and acts accordingly. No prudent man handles these things with a low degree of caution."

It is also well settled, however, as stated in *Burns* v. *Telephone Co.*, 70 N. J. Law, 745:

"It is not merely the physical surroundings of the servant that must be obvious to him in order that he may be held to have assumed the risks arising therefrom, but it must be obvious to him, or, at least, to an ordinarily prudent servant, under the circumstances, that there is danger in such a situation."

See, also, *Smith* v. *Car Works*, 60 Mich. 501; *Ribich* v. *Smelting Co.*, 123 Mich. 401 (48 L. R. A. 649).

And when there is a possible phase of the case where the risk is not assumed, the trial judge cannot properly direct a verdict on the ground that such risk was assumed. *Murphy* v. *City Coal Co.*, 172 Mass. 324.

*Davis* v. *Thresher Co.*, 126 Mich. 429, is quite similar in principle to the present case. In that case the plaintiff's regular employment was as a helper in the machine shop, but, needing a man to take the place of one Riggs, who looked after the electrical wiring of the lighting plant for defendant, defendant had selected Davis to fill this position in addition to his regular duties. Davis had been engaged in assisting a regular electrician in rewiring the plant and repairing the same and had had some two or three months' experience prior to the injury which resulted in his death. He had been informed that contact with a live wire was dangerous and his attention had been

called at one time to a flash of fire that came from a guy rod to a water tank tower with which one of the wires in question accidentally came in contact. There was no evidence that Davis knew the extent of the current, and, as stated by his counsel in their brief:

"He did not know these live wires were carrying such a dangerous current nor how dangerous contact might be made, nor the precautions necessary, and he received no instructions on that point or warning of the danger, except possibly the most general kind of a warning from Riggs, as he was ascending the ladder, to look out for the electric light wires. Riggs had been doing this wiring around the premises for some time, but he was not a lineman, nor did he profess to be, and seems to have been ignorant of the precautions which should have been taken in crossing live wires with another wire which might form a ground connection, but Davis had no knowledge of this ignorance and it only developed on the trial."

Davis, after crawling with the wire he was to string under the electric light wires,—

"Attempted to walk westerly on the south side of the east and west gable, and as he did so he seems to have slipped, as the testimony puts it, and, either to save himself from falling or thoughtlessly, he took hold of the electric wire with his hand. In the other hand he held the bell wire, the coil of which Riggs had on his arm standing on the ground, which formed a complete ground connection. The electric current passed from the wire through his arm and body, and down this wire into the ground, and killed him instantly."

The ruling of the circuit judge directing a verdict was affirmed on the ground that the plaintiff had assumed the risk.

Referring to *Smith* v. *Car Works* and *Ribich* v. *Smelting Co.*, supra, the court said:

"In each of these cases the injured party was ignorant of any danger of injury. In none of them was it held that it is the duty of the master to foretell the exact extent of the injury likely to follow any negligence of the warning of danger. This is never precisely known in the

case of an obvious danger. If deceased knew that contact with this wire would cause him severe injury, he had sufficient warning. This is all the most expert could have known in advance, and there can be no doubt on this record that deceased knew this."

It is apparent, from the testimony of the plaintiff himself, that he fully understood the danger of contact with the trolley wire or the electric lighting wires, but it is insisted on his behalf that he did not know that he would come in contact with the trolley wire in case the wire which he held in his hand fell upon it; that he supposed that he was insulated by being upon the dry cedar pole and did not know that the live telephone wires which were in contact with his body were grounded; or that if the wire he was stringing got away from his helper and fell upon the ground that would create a circuit through his body. As to whether the plaintiff actually had knowledge of what constituted a grounding of himself or of the telephone wires, and as to whether he was ignorant of the fact that he was not insulated while in his position upon the pole, were questions of fact for the jury. As to whether plaintiff's lack of knowledge was justifiable or not presents another question. We think it must be held that it was not.

It was said by the court in *Chisholm* v. *Telegraph Co.*, 176 Mass. 125:

"The danger from an imperfectly insulated wire is the most characteristic risk which a lineman has to encounter. That general risk the deceased assumed by entering upon his employment."

So in this case the danger from contact with the highly charged wires, which, in a city the size of Ann Arbor, in view of modern conditions, plaintiff was likely to have to pass over with the wires of defendant, was a characteristic risk and the principal risk which he was likely to have to encounter. Contact with the highly charged wires might be formed and was most likely to be occasioned by other means than seizing hold of said wires,

and we think it was implied in the contract of hiring plaintiff as a lineman that he knew those things with reference to the creating of grounds and circuits which a telephone lineman must necessarily know in order to conduct his business with any degree of safety whatever to himself, his employer, or his co-employés.   We also think it must be held that knowledge of the grounding of defendant's telephone wires was such an essential fact in their business that the plaintiff, who had worked in their employ as "trouble man," lineman, ground man, and otherwise for over a year, must be charged with constructive notice of such fact.

It is argued, however, that, regardless of his knowledge, actual or constructive, of the negligence of his employer and the danger involved in consequence thereof, he is protected by the rule that the employé does not assume the risk of dangers arising through the negligence of the employer.   While the rule is well settled, it does not apply in cases where the negligence and the resulting danger are discovered by and known to the employé before entering upon the performance of the work.   To hold otherwise would be to apply to cases like the present the rule which is only applicable in cases where the risk grows out of the violation by the employer of statutory provisions for safeguarding employés.   *Swick* v. *Cement Co.*, 147 Mich. 454.

The judgment is reversed, and a new trial ordered.

Montgomery, Carpenter, and McAlvay, JJ., concurred.   Grant, C. J., concurred in the result.