ARGERSINGER *v.* COMMONWEALTH POWER CO.

1. MASTER AND SERVANT—WARNING AND INSTRUCTING SERVANT—PROXIMATE CAUSE.

In an action by a lineman of an electric power company, for injuries received by coming in contact with high tension wires which he was not informed were charged, a failure to instruct plaintiff how to handle live wires was not a ground for recovery, under testimony showing that plaintiff was not handling or attempting to handle live wires at the time he was injured.

2. SAME—NEGLIGENCE—PROMISE TC WARN—FELLOW-SERVANT—RISKS ASSUMED.

Where the employé of defendant, superintending the gang in which plaintiff was employed, promised, at the time of hiring plaintiff, to warn him when he should begin to work among dangerous wires, the promise was within the scope of the authority of the superintendent who had authority to hire men, and created a duty of defendant which could not be delegated, and negligence in omitting to give the promised warning was not the negligence of a fellow-servant. HOOKER, J., dissenting.

3. Same — Duties of Master — Promise to Warn — Assumption of Risk.

> But it was error to charge the jury that a duty existed to give such warning independent of the superintendent's promise to advise plaintiff of the danger.

Error to Jackson; Parkinson, J. Submitted November 18, 1910. (Docket No. 80.) Decided February 1, 1911.

Case by Byron S. Argersinger against the Commonwealth Power Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*W. S. Westerman* and *Wilson & Cobb,* for appellant.

*A. A. & H. A. Ellis,* for appellee.

Hooker, J. The defendant is engaged in the production, transmission, and sale of electric power of high voltage, in various cities, villages, and rural districts in this State. It employs several gangs of men in the reconstruction and repair of its system of poles and wires. These gangs are called "wire" or "line gangs." They are in charge of men called by some witnesses superintendents and by others foremen. Each superintendent or foreman of a line gang has an assistant called an "assistant foreman." It matters little what the man in charge of the gang is called. The practice was that he went with the gang, kept it full by employing and discharging men, made requisition on the company for such materials as he needed in the carrying out of his orders, and keeping his division of the line in proper condition. He directed the men in their work, and, when absent, his assistant took his place in this respect. The plaintiff was a lineman. He climbed a pole to aid in soldering a wire, and, in attempting to straddle the wire upon which he was called up to work, raised up too high, and his body came in contact with two high voltage or primary wires which were strung upon the top cross-bars of the poles, and he was seriously

injured. He recovered a judgment for $10,000, and the defendant has appealed.

The theory upon which he recovered was that he was a novice, and informed defendant's superintendent who hired him that he did not know which wires were dangerous, and was promised that he should be informed, and that this was a duty that the master could not avoid liability for, if not performed. If the defendant is to be found guilty of negligence, it must be upon the ground (1) that the plaintiff being a novice was not instructed as to the danger and proper methods of work, or (2) that he was allowed to work in ignorance of the fact that live wires were upon that particular pole.

1. **Failure to Instruct.** The plaintiff testified that he did not know how to handle hot wires; that he had never worked among them previous to his employment. This is not disputed. Therefore, when he was employed, it was a duty of the defendant to instruct him of the dangers he would encounter and how to avoid them, the omission of which the master could not escape liability for by delegating it to another, if the omission was the cause of the accident. It is clear, however, from the admitted facts, that this plaintiff was not hurt while engaged in handling hot wires, and it is also clear that he knew the danger of coming in contact with wires of high voltage which he knew were to be often found on the poles. So, for the purposes of this case, the failure to instruct is unimportant, and cannot be made the ground for recovery upon this record.

2. **Defendant's Promise.** We have seen that the plaintiff was employed by the defendant's gang foreman. Under many authorities he was a fellow-servant of the plaintiff. *Schroeder* v. *Railroad Co.*, 103 Mich. 213 (61 N. W. 663, 29 L. R. A. 321, 50 Am. St. Rep. 354); *Beesley* v. *Wheeler & Co.*, 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266). In *Mikolojczak* v. *Chemical Co.*, 129 Mich. 80 (88 N. W. 75), a foreman in a salt plant was held to be a fellow-servant, and many cases are cited. In

*Guest* v. *Illuminating Co.*, 150 Mich. 438 (114 N. W. 226), a foreman of a line gang negligently omitted to close a switch for the protection of a lineman to whom he had promised to watch that switch every minute and protect plaintiff in certain work. He was held to have been a fellow-servant; Mr. Justice BLAIR saying:

"Unless the foreman's failure to perform his agreement to watch the switch box and see that it was not interfered with was a failure to discharge a duty which the corporation owed to plaintiff, no negligence was proved on its part. On the contrary, the plaintiff's evidence conclusively demonstrates that, except for the alleged new duty arising from the agreement, the defendant discharged its full duty to plaintiff. Independent of the agreement, there was certainly no rule of law which made the defendant an insurer of the plaintiff's safety. If the agreement acquired binding force against the defendant, it was not because authority had been impliedly delegated to the foreman to make it, in discharge of an absolute duty of the defendant, but because his position as foreman authorized him to bind the defendant to the performance of an absolute duty which theretofore had not existed, and which was in derogation of its rules. Whether any officer of a corporation, however high his grade, would be acting within the scope of his authority in making such an agreement for the corporation, it is unnecessary to determine. We are satisfied that the foreman Davis possessed no such authority, and that in making the agreement he did not represent the defendant."

See *Page* v. *Pure Food Co.*, 142 Mich. 17 (105 N. W. 72); *Lepan* v. *Hall*, 128 Mich. 523 (87 N. W. 619); *Amoe* v. *Engineering Works*, 151 Mich. 213 (114 N. W. 1010), and cases cited. See, also, *Ferry* v. *Gas Producer Co.*, 153 Mich. 269 (116 N. W. 1073); *Corey* v. *Iron Co.*, 131 Mich. 558 (115 N. W. 737), and cases cited.

It is said that Lipscomb, the foreman, promised to inform the plaintiff whenever they should get among hot wires, they being at the time of plaintiff's employment engaged in constructing a new line where there was no current. Plaintiff's counsel contend that this made it the master's duty to see that plaintiff should be informed cor-

rectly about the wires whenever called upon to climb a pole, and that neglect to inform or misinformation by a fellow-servant, followed by injury, gave a right of action against the master. It is clear that in his act of employing men Lipscomb represented the master, and, it is claimed, bound the master by the agreement made. If it be assumed that a master is bound by a contract made by a servant authorized to hire men, although in terms not authorized to make the particular contract actually made (which we do not decide), it becomes necessary to examine this contract.

**Contract.** The contract is alluded to thrice in plaintiff's testimony, which is all the testimony offered by him on that subject. On his direct it is summed up in the answer to plaintiff's statement that "he knew nothing about handling hot wires." "Well, this is new work here. Now there is no current on it, and, when we get into hot stuff, either Willett or I will be there to tell you," and plaintiff's reply, "All right, under those conditions I will go to work at it." On his cross-examination plaintiff repeated this answer of Lipscomb as follows:

"He says to me: 'This is all new work now, and, when we get into hot stuff, hot wires, either I or Willett will be there to tell you.'"

In another place he stated it as follows, when asked on cross-examination for Lipscomb's exact words:

"*Q.* In reply to your statement you didn't know anything about live wires, he says, 'It is new work now, no current on, and, when we get into hot wires, either I or Willett will tell you about it,' is that your recollection?
"*A.* Yes, sir."

From the foregoing, it is evident that the words stated are susceptible to two constructions: (1) That, until they got into hot wires, there would be no danger of electric injuries, and that, when they should get among live wires, he could ascertain from, or would be told of the fact by, the foreman or his assistant; or (2) that, when they

should get among hot wires, one or the other would tell him about handling them. If this contract was merely to inform plaintiff when he should get into hot wire work, it was performed, unless it should be construed to mean that he should be informed repeatedly and whenever asked to climb a pole whether he would find hot wires on the pole, for he was afterwards sent with an experienced man to work among live wires, and told that he would tell him which were the live wires, and he worked under such circumstances on poles carrying live wires several times. So that he knew that he had reached the end of the job that he first entered upon where there was no current, and had been called upon to work among hot wires which he knew could not be cut off from the poles, without stopping defendant's business, and which wires might seriously injure or kill him should he get in contact with them. If, however, in addition to a promise to tell him when he should get through with the new line where there were no hot wires, the jury should conclude that the last quotation was a promise to instruct him about handling hot wires, it was not necessary to create such an obligation, for it was the duty of the master to do that in any event, because, plaintiff being a novice, the defendant could not avoid the responsibility whether he made such a contract or not. So we may say that it was the duty of the master to instruct plaintiff how to handle hot wires. We must assume plaintiff's testimony to be true for the purposes of this hearing, although it was contradicted. But the most that it shows is that Lipscomb promised that either he or Willett would be there to tell him when he should be asked to work among hot wires, and would instruct him how to handle them.

Now, he was not hurt in handling hot wires, for he was not handling them. He was hurt by getting against hot wires which he had been told, and already knew, was a dangerous thing to do. His injury was not chargeable to a failure to instruct him about handling hot wires, but may perhaps justly be ascribed to the misinformation that

there were no live wires on the pole.  On this subject the clear language of the promise was that, when he should get among hot wires, the foreman or his assistant would be there to tell him.  He asked this assistant twice, and was twice informed that there were no hot wires up there, and it is reasonably probable that this caused him to make no effort to avoid the upper wires, which he knew that he should do, if they were hot wires.  He relied on this information, and the jury might properly find that he was not negligent in so doing.  Now, if this misinformation was through the negligence of a fellow-servant only, he cannot recover.  We understand that counsel claim that Willett's act was that of the master on two grounds: (a) That under general principles it was the duty of the master to apprise him of the condition of the wires on the poles, regardless of any promise. (b) That Lipscomb promised that the master should do so.

(a) **Master's Duty to Apprise Him of Hot Wires.** This proposition means that, whenever a lineman climbs a pole, the master himself assumes the obligation of giving him accurate information regarding the wires, and that he must send enough competent men to see to this, and not only that, he must also be held responsible for their negligence. This is not the law, there being many cases holding that this is a duty that can be delegated, and that the person upon whom that work is imposed may be a fellow-servant, some of which have been already cited. There is a distinction between the warnings of the dangers of a calling or of an established place to work which the master may not delegate and the dangers arising from time to time in the conduct of the business, which are inevitable to such business.  The duty of warning may be delegated in the latter cases.  Thus a flag or switchman may be required to protect and warn trains and trainmen, and his act is that of a fellow-servant.  A master may delegate to a foreman the duty of protecting his lineman by guarding an electric switch, as we held in the case of *Guest* v. *Illuminating Co.*, 150 Mich. 442 (114 N. W.

226). In the present case, it is shown to have been the practice of defendant's foreman to advise the men in his gang each morning of the presence of live or high voltage wires, and to point them out, said wires occupying a similar place and cross-bar on all poles. It appears to have been one of his regular duties or practices, and, being the act of a fellow-servant, in the work upon which all were engaged, the master was not liable under the Michigan rule. Counsel have found it easy to find cases that appear to sustain his contention in other States where statutes or different rules affect the question. See *Beesley* v. *Wheeler & Co.*, 103 Mich. 201 (61 N. W. 658, 27 L. R. A. 266), where this practice is discussed.

(*b*) The Promise of Lipscomb. It is contended that Lipscomb's promise required more, and pledged the plaintiff special care from the master, but we think that the language is not open to such a construction, even if such a promise, had it been made, would bind the master, a matter which we need not and do not decide. The language of the promise was that the fellow-servant, Lipscomb, or his assistant (also a fellow-servant), Willett, would be present to tell him about, or perhaps designate, the hot wires. That was the regular practice. This was not a promise that the master would be there and give him the information. The language was nothing more than the statement that there would be certain men, naming them, to tell him. It was not a statement that the master would do more than was the ordinary practice, *i. e.*, to have one of two named fellow-servants, known by plaintiff to be fellow-servants, whose duty it was, as he well knew, to be on the ground to tell him about the hot wires, whenever it should be necessary. This is all that the language could import, and, to say that it was an undertaking or promise to do more is, in my opinion, the judicial making of a new and different contract for the parties, whereby the agreement is that the master shall not only do what was promised and what was performed, but,

164 MICH.—19.

in addition, that he would guarantee the accuracy of such information as these men might give him, while as to no other man on the job was there any such undertaking, for the reason that they were fellow-servants. They were both there, and the latter did tell him, but was mistaken or misunderstood. If we say that he was negligent, it was still the negligence of a fellow-servant, and, so far as the master's promise (if it can be said to have been his) is concerned, it was at most that he would have a fellow-servant there to give him information, which was the general practice, not that he would assume responsibility for the negligence of such fellow-servant. Hence we decide, not that the master could not itself have made a binding contract to itself see that he had accurate information, nor even that a fellow-servant to whom it had confided the employment of men might not have bound it by such a contract had such a contract or promise been made (though see *Guest* v. *Illuminating Co.*, 150 Mich. 442 [114 N. W. 226]), but that neither master nor foreman has made such a contract.

It is urged that, this alleged contract not being in writing, the jury should have been allowed to decide what its terms and intentions were. It is true that, where there is contradictory testimony, a jury must settle the question raised, but where, as in this case, the language is clear, there is no more reason for permitting the jury to find a contract which the language proved has no tendency to sustain than to allow the same thing where the contract is in writing.

In *Green* v. *Soule*, 145 Cal. 96 (78 Pac. 337), the court said:

"Where there is no conflict in the evidence with respect to the terms of a contract and such terms are not in any respect ambiguous or uncertain so as to require any fact to be established in order to determine its effect, the meaning and effect of the contract and the relation of the parties to it thereby created is a question of law, to be decided by the court."

In *Smith* v. *Humphreyville*, 47 Tex. Civ. App. 140 (104 S. W. 495), the supreme court of Texas said:

"The mere fact that a contract is verbal does not require the submission of the question of the relation of the parties to the jury, although the only evidence introduced as to the contract is the testimony of the contractor himself, where it is clear, unambiguous, and undisputed."

Our own court said in *Burns* v. *Paint Co.*, 152 Mich. 615 (116 N. W. 183, 16 L. R. A. [N. S.] 816):

"We are of the opinion that a verdict should have been directed in defendant's favor upon the ground that there was no evidence from which the jury could infer that Boyseau was defendant's servant. The burden rested upon plaintiff to prove the existence of the relationship of master and servant between defendant and Boyseau. The only evidence offered by her tending to prove that fact was the sign on Boyseau's wagon and his declaration that he was working for the defendant. In the absence of any explanation, this circumstance and this statement might have warranted the inference that the relation of master and servant existed. That circumstance and statement are, however, entirely consistent with the relation of independent contractor testified to by Boyseau and defendant's manager. In other words, there is no conflict between the testimony upon which plaintiff relies as proof of liability and the testimony which we are bound to hold establishes nonliability. It may be said that the circumstance and admission of Boyseau cast upon defendant a duty of explanation. This duty defendant fully performed. The case does not differ in any legal sense from the many cases in which this court has held that the party upon whom rests the burden of proof is entitled to recover because he has established his case by undisputed testimony. The trial court should have directed a verdict in defendant's favor."

We are therefore constrained to hold that there was error in refusing to direct a verdict in favor of the defendant.

The judgment is reversed, and a new trial ordered.

BROOKE, J., concurred with HOOKER, J.

BLAIR, J. In my opinion the trial judge did not err in refusing to direct a verdict for defendant. The vital question in the case was as to the alleged contract of employment. Plaintiff testified, in substance, that he informed Lipscomb of his experience in handling hot wires, and that Lipscomb promised him that, when they got among hot wires, either he or his assistant foreman, Willett, would be there to tell him. Lipscomb denied making any such promise, and the question of fact was properly submitted to the jury. Lipscomb testified:

"I did not tell Mr. Argersinger any more than any other lineman when they were in hot wires or working on hot wires, and never agreed to. If I send a man up a pole to do anything, I always explain to him what is up there. I would say such and such a wire is a primary; such a wire is a secondary, and this is the arc circuit, and so on; show him what I want him to do and go on. If I saw a man working on a pole and he was getting against a primary, I would call his attention to it. * * * My reason for giving the men such instructions was because it is a pretty dangerous position to get between — get against two wires. Of course, it depends a good deal on what they are. If you get against two primaries, they are pretty sure to get you. I instructed them to that effect. * * * I told him the same as I told everybody else, when he went on a pole to work, that every wire was alive unless he knew it was dead. That's our practice. * * *

"Q. Now, I understood you to swear yesterday whenever there were hot wires on any pole, you told the men?

"A. If I was there and sent them upon a pole to do a job, yes, I told them; told them what was up there.

"Q. How long have you been in the habit of doing that?

"A. Always did.

"Q. Did you have any printed rules of the company?

"A. No, sir.

"Q. Who came around to look after you or superintend your business in any way?

"A. J. B. Foote. I think he knew how I was doing my business.

"Q. He knew how you were transacting your business?

"*A.* He did. He is general superintendent.

"*Q.* How long had the company known how you transacted your business?

"*A.* I suppose the company always knew how I transacted my business. There is no danger from dead wires. If I was there, I always explained to them if there were hot wires on a pole. If there were dead wires, I didn't explain anything, or tell them not to get between two dead wires. I don't remember ever telling Argersinger not to get between two dead wires. It was not understood that it was dangerous to get between two dead wires if you knew they were dead."

The promise found by the jury to have been made is to be construed with reference to the surrounding circumstances, and especially to the custom of the local superintendent who made the promise of explaining to a man when he was sent up a pole what was there. I am therefore of the opinion that the promise should be construed to mean that, when plaintiff's duty required him to go upon a pole, either Lipscomb or his assistant would notify him if there were live wires there of a dangerous voltage.

Was this promise binding upon the company? This question is also to be considered, not only with reference to the general power committed to Lipscomb to hire and discharge the employés of the company, but as well with reference to the uniform practice of Lipscomb in giving warning to such employés. So considered, I am of the opinion that the promise would bind the company. Undoubtedly Lipscomb represented the defendant in hiring its employés, and, so long as his contracts were within the scope of his authority and no notice of any limitation thereof was chargeable to the employé, the defendant would be bound. We do not think it can be said that an agreement to do what the defendant fully understood was being done without express agreement therefor, and which it tacitly authorized to be done, should be held to be beyond the scope of the agent's authority. We have repeatedly held that there is an implied contract on the part of an employé to assume the obvious risks of his service,

including the characteristic risks which a lineman has to encounter and which a lineman must necessarily understand in order to safely prosecute his calling. *De Kallands* v. *Telephone Co.*, 153 Mich. 25 (116 N. W. 564). In this case the plaintiff sought to guard against certain characteristic dangers of his calling, and entered upon his service upon the express promise of defendant's acknowledged representative for the purpose of the contract of hiring that he should be protected against those risks. The promise to protect him by warning was a part of the consideration for his promise of service, and became an obligation of the master as much as the promise to pay a certain amount of wages for the service, and the negligence of Lipscomb or Willett was the negligence of the defendant.

The case of *Guest* v. *Illuminating Co.*, 150 Mich. 438 (114 N. W. 226), has no bearing upon this question, in my view of this case. I am therefore of the opinion that, so far as this question is concerned, no error was committed.

I am of the opinion, however, that the court erred in charging the jury as follows:

"And in like manner I instruct you if there was no such agreement, promise, understanding, or stipulation at the time of the hiring, and no such duty imposed by any understanding had, but if Lipscomb heard plaintiff inquire of Willett, as claimed by him, and heard Willett's answer as claimed, and understood it and could see that the plaintiff was getting into danger, and was in such proximity to the place that by acting promptly and diligently he could have corrected the mistake on Willett's part and have properly informed plaintiff, and in time to have prevented him from encountering the danger from coming in contact with these wires carrying that high voltage of 2,280, and that he neglected to use proper and reasonable diligence to prevent the accident, then the company would be held responsible for his negligence or lack of due care, and would, for that reason, be liable, in case plaintiff himself was exercising due care for his own protection, and was not himself careless and by his carelessness helped to bring about the accident and consequent injury."

The instruction must be predicated upon the view that Lipscomb represented the employer as a vice principal, and that negligence on his part in failing to warn plaintiff was the negligence of the employer, independent of any agreement of the employer to warn him in the contract of hiring. I think the decisions of this court are not in harmony with this theory. *Mikolojczak* v. *Chemical Co.*, 129 Mich. 80 (88 N. W. 75); *Ferry* v. *Gas Producer Co.*, 153 Mich. 266 (116 N. W. 1073); *Corey* v. *Iron Co.*, 151 Mich. 558 (115 N. W. 737); *Amoe* v. *Engineering Works*, 151 Mich. 212 (114 N. W. 1010).

I therefore concur in reversing the judgment.

OSTRANDER, C. J., and BIRD, MOORE, MCALVAY, and STONE, JJ., concurred with BLAIR, J.